[No. S104701. Dec. 16, 2002.]

In re ROBERT ROSENKRANTZ on Habeas Corpus.

## COUNSEL

Rowan K. Klein; Prison Law Office, Donald Specter, Zachary Katznelson; Munger, Tolles & Olson, Alan V. Friedman and Mark H. Epstein for Petitioner Robert Rosenkrantz.

Picone & DeFilippis and Steve M. DeFilippis as Amici Curiae on behalf of Petitioner Robert Rosenkrantz.

James F. Sweeney for California Catholic Conference as Amicus Curiae on behalf of Petitioner Robert Rosenkrantz.

American Civil Liberties Union Foundation of Southern California, Mark D. Rosenbaum; American Civil Liberties Union Foundation of Northern California, Alan L. Schlosser; Latham & Watkins, Peter A. Wald, Stephan E. Klein and Kyra G. Busby for Judge James Albracht, Allen Breed, Raymond Procunier, the California Council of Churches, the Order of the Society of Jesus, the Sisters of Saint Joseph of Carondelet—the Los Angeles Province Leadership and Justice Office, the Board of Rabbis of Northern California, the Directors of the Office of Detention Ministry of the Twelve Dioceses of the State of California, the Advisory Board of the Office of Detention Ministry, the Catholic Chaplains from the Los Angeles Archdiocese Serving the State and Local Prisoners and the California Coalition for Battered Women in Prison as Amici Curiae on behalf of Petitioner Robert Rosenkrantz.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Susan Duncan Lee and Robert D. Wilson, Deputy Attorneys General, for Respondent the People.

Jones & Mayer, Martin J. Mayer and Michael R. Capizzi for California State Sheriff's Association, California Police Chief's Association and California Peace Officer's Association as Amici Curiae on behalf of Respondent the People.

Steve Cooley, District Attorney (Los Angeles), George M. Palmer, Head Deputy District Attorney, and Brentford J. Ferreira, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Respondent the People.

Daniel V. Felizzatto for Crime Victims United of California as Amicus Curiae on behalf of Respondent the People.

Robert S. Gerstein; Bien & Summers and Elliot L. Bien for California Academy of Appellate Lawyers as Amici Curiae.

**OPINION**

**GEORGE, C. J.**—In 1986, petitioner Robert Rosenkrantz was convicted of second degree murder and was sentenced to an indeterminate term of

imprisonment for 15 years to life, plus two years because of his use of a firearm in the commission of the offense. In June 2000, after several hearings before the Board of Prison Terms (the Board) and rulings by the superior court and the Court of Appeal, the Board, in compliance with the mandate of an earlier judicial decision, found petitioner suitable for parole and set a parole date. The Governor, however, found petitioner unsuitable for parole and reversed the Board's decision. In a petition for writ of habeas corpus, petitioner challenged on several grounds the Governor's decision denying parole. The superior court granted the petition after concluding that there was no evidence supporting the Governor's decision, and that the Governor's decision was based upon an impermissible general policy of automatically denying parole to prisoners convicted of murder. The Court of Appeal affirmed the judgment rendered by the superior court, concluding that the law of the case doctrine supported the superior court's determination that there was no evidence to support the Governor's decision.

We granted review primarily to consider whether a decision of the Governor finding a prisoner unsuitable for parole is subject to judicial review and, if so, under what standard. After review was granted, petitioner requested this court to address an additional, threshold issue that petitioner had not timely presented to us—namely, whether the Governor's review of the Board's decision in this case is barred by the ex post facto clause of the federal and state Constitutions, because article V, section 8, subdivision (b) of the California Constitution (hereafter article V, section 8(b))—the provision that grants the Governor the authority to review the Board's parole decisions in a case such as this—was adopted in 1988, after petitioner had committed the underlying offense.

Although we are not required to address this belatedly presented issue, we conclude that it is appropriate to consider and resolve the ex post facto question in this case. As we shall explain, in conformity with the views of each of the state and federal courts that previously has addressed this ex post facto question, we conclude that petitioner's ex post facto claim lacks merit and that the Governor's review of the Board's parole decision in this case did not violate the ex post facto clause of the federal or state Constitution.

With respect to the principal issue upon which we granted review, we conclude that a Governor's decision granting or denying parole is subject to a limited judicial review to determine only whether the decision is supported by "some evidence." As we shall explain, article V, section 8(b), does not grant a Governor unfettered discretion over parole matters, but rather explicitly requires his or her parole decision to be based upon the same factors that

the Board is required to consider.[1] At the time article V, section 8(b), was adopted, it was established under California law that although the Board exercises broad discretion in determining whether to rescind parole, such decisions are subject to a form of limited judicial review to ensure that they are supported by at least "some evidence." (*In re Powell* (1988) 45 Cal.3d 894, 904 [248 Cal.Rptr. 431, 755 P.2d 881] (*Powell*).) We conclude that a Governor's decisions under article V, section 8(b), are subject to this same type of limited judicial review, and that under this standard a court is authorized to review the factual basis of the Governor's decision only to determine whether it is supported by some evidence relevant to the factors the Governor is required to consider under article V, section 8(b). This limited judicial review of a gubernatorial parole decision, for the purpose of determining whether it is supported by some evidence, does not usurp the executive's discretionary authority over parole matters or otherwise violate the separation of powers doctrine. Rather, such review simply ensures that parole decisions are supported by a modicum of evidence and are not arbitrary and capricious.

With regard to the Governor's decision in the present case, we conclude initially that the Court of Appeal erred in concluding that the law of the case doctrine establishes that the Governor's decision is not supported by some evidence. The prior appeal that was deemed by the appellate court to constitute the law of the case involved a different case, different parties, and a different underlying decision denying parole, and therefore does not support application of the law of the case doctrine. In addition, after conducting our own review of the Governor's decision (set forth in a 12-page document) reversing the Board's action granting parole to petitioner, we conclude that the Governor's decision in this case is supported by some evidence in the record, and further that the record does not support the trial court's finding that the Governor's decision in petitioner's case resulted from a blanket policy of denying parole in all cases in which a prisoner has been convicted of murder.

Accordingly, we shall reverse the judgment of the Court of Appeal in favor of petitioner and shall direct that the requested writ of habeas corpus be denied.

---

[1]Article V, section 8(b), provides in full: "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

## I

## A

In 1986, petitioner was convicted of second degree murder and was sentenced to an indeterminate term of 15 years to life, plus two additional years because the jury found true an allegation that he personally used a firearm in the commission of the offense. On appeal, the Court of Appeal affirmed petitioner's judgment of conviction. (*People v. Rosenkrantz* (1988) 198 Cal.App.3d 1187 [244 Cal.Rptr. 403] (*Rosenkrantz I*).) Because resolution of the issues in the present case depends in part upon a consideration of the circumstances of the offense and the particular verdicts rendered in petitioner's trial, we begin by summarizing the facts of the crime as set forth in *Rosenkranz I*. (*Id.* at pp. 1191-1199.) Additional details regarding the circumstances of the crime and petitioner's subsequent conduct will be discussed in connection with our analysis of the contentions of the parties.

At the time of the offense, petitioner was 18 years of age and resided with his parents and two brothers in Calabasas in Los Angeles County. Petitioner testified that he knew at an early age that he was gay but also knew that this circumstance was unacceptable to his family—particularly to his father, whom he idolized. Petitioner pretended to be heterosexual but secretly was able to communicate with and meet other gay teenagers. Petitioner's brother Joey, then 16 years of age, suspected that petitioner was gay and shared this suspicion with Steven Redman, Joey's 17-year-old friend. According to petitioner, Redman was a bully and was preoccupied with hatred of homosexuals, and Joey also disliked such individuals.

By eavesdropping on petitioner's telephone conversations, Joey learned that petitioner planned to meet another young male at the family's beach house on the evening petitioner graduated from high school—Friday, June 21, 1985. Redman suggested that he and Joey go to the beach house that night to investigate and gather information concerning petitioner's sexual orientation. Upon arriving at the beach house, Redman and Joey looked through a window and observed petitioner, two other males, and one female drinking and watching television.

When petitioner and his male companion entered a bedroom, and Joey and Redman no longer could view petitioner's activities, Joey wanted to leave. Redman, however, decided that he would run into the house and take photographs. Before he did so, Redman and Joey retrieved a flashlight and a stun gun from Joey's automobile. Joey unlocked the door to the house and Redman kicked it in, shouting, "Get the fuck out of here you faggots." A

physical confrontation ensued in which Joey burned petitioner's hands by firing the stun gun, Redman struck petitioner several times with the flashlight, petitioner's companion punched Redman, and petitioner burned Joey on the face after having gained control of the stun gun. Petitioner's nose was broken during the altercation.

The fighting ceased when petitioner's other friends intervened, but petitioner then obtained a BB gun from his automobile and attempted to prevent Redman and Joey from leaving the house. Joey stated that he had recorded telephone calls confirming petitioner's homosexuality, and that the tapes were in his automobile. Joey managed to escape when petitioner accompanied him to retrieve the tapes. Because petitioner had taken the keys to Joey's automobile, however, Joey telephoned their father, who drove to the beach house and spoke with petitioner. Petitioner surrendered Joey's keys to his father. Before Redman and Joey left, Redman stated to petitioner's father that he and Joey had observed petitioner with another male who had his pants down.

The next morning, petitioner insisted to his father that he was heterosexual and that Redman and Joey had lied. Petitioner's father, very upset by the possibility that petitioner might be gay, broke down and cried during the conversation with petitioner. Petitioner and Joey had decided that Joey would inform their father that the entire incident had been a joke, and Joey recanted his story concerning petitioner's homosexual conduct. Redman, having been summoned by the boys' father, modified his story regarding what he had observed the previous evening, but petitioner's father gradually realized that petitioner was gay. He confronted petitioner and angrily questioned him regarding his activities and contacts. Petitioner gathered his possessions and left the house, sleeping in his automobile that night.

On Monday, June 24, petitioner went to a shooting range and rented an Uzi semiautomatic nine-millimeter carbine. Petitioner testified that he had planned to kill himself at the shooting range, but then decided to use the gun to teach Redman a lesson. After shooting the weapon on the firing range for 10 or 15 minutes, petitioner stated to the manager that he wished to purchase an Uzi and did not want to wait for it to be ordered. When the manager refused to sell him the weapon he had rented, petitioner left. Also on Monday, petitioner visited a sporting goods store and arranged to purchase an Uzi that would be available on Wednesday, June 26.

Petitioner was employed at a restaurant and worked there during this period. On Tuesday, June 25, petitioner stated to a coworker that he had purchased a gun and was planning to kill his brother. Petitioner also informed another coworker that Redman and Joey had humiliated petitioner and that he was obtaining a gun.

On Wednesday, June 26, petitioner obtained the Uzi he had ordered and purchased 250 rounds of ammunition. Petitioner testified that he telephoned Redman that night, but Redman hung up on him. Petitioner thought that he might use the Uzi to force Redman to recant what he had told petitioner's father regarding petitioner's sexual activities. On Thursday, having telephoned two individuals who knew Redman, petitioner succeeded in learning where Redman resided. Petitioner again telephoned Redman, who refused to recant his statements regarding petitioner's sexual orientation.

On Thursday night, petitioner traveled to the condominium complex where Redman resided and unsuccessfully attempted to locate Redman's vehicle. Petitioner spent the night in his own automobile near the complex. The next morning, June 28, when Redman was driving away from his home, petitioner used his vehicle to block Redman's vehicle and confronted Redman, who asked petitioner what he wanted. Holding the Uzi, which was loaded and ready to be fired, petitioner responded, "I think you know what I want." According to petitioner, Redman called him a "faggot" and said petitioner was in a lot of trouble. Petitioner twice asked Redman to accompany him to petitioner's home to recant what Redman had said. Redman responded, "I'm not going anywhere with you, you goddam faggot." When Redman asked petitioner what he was going to do with the weapon, petitioner stated that he was going to use it to damage Redman's car. Redman reiterated that he would not go anywhere with petitioner. Petitioner then pointed the gun at Redman and began shooting. Redman sustained at least 10 gunshot wounds, including six wounds to the head. There was evidence that the Uzi had been fired at very close range. Redman died from the shooting.

Petitioner walked away from the body and entered his vehicle, still pointing the weapon at Redman. In a telephone conversation that morning with Joey, petitioner cried and stated that he had done something terrible to Redman. That evening, petitioner telephoned a deputy sheriff who also had been petitioner's teacher at school. In this conversation, which was recorded, petitioner admitted the shooting and expressed attitudes ranging from remorse to defiance.

In the weeks following the shooting incident, petitioner traveled to various towns in northern California and Oregon, spending time with friends. Approximately one month after the shooting, petitioner, accompanied by his attorney, surrendered to the investigating deputy sheriff. Petitioner was charged with murder (Pen. Code, § 187), and the complaint also alleged that petitioner personally used a firearm in the commission of that offense (*id.*, § 12022.5).

At trial the defense presented expert testimony indicating that the dramatic disclosure of petitioner's sexual orientation, and his father's reaction to it,

caused petitioner to suffer extreme stress and emotional turmoil, which impaired his ability to think rationally during the week preceding his commission of the crime and, in particular, at the time of the crime. Although a defense expert testified that in his opinion petitioner had not planned to kill Redman during the week preceding commission of the crime, the expert further testified that petitioner might have possessed the intent to kill Redman at the time of the crime.

The jury was instructed on first degree murder, second degree murder, and voluntary manslaughter. As stated above, the jury found petitioner guilty of second degree murder and found true the allegation regarding use of a firearm.

## B

The proceedings related to petitioner's application for parole have been protracted. We summarize the pertinent events and proceedings, relying in part upon the history set forth in the Court of Appeal's decision in *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 413-423 [95 Cal.Rptr.2d 279] (*Rosenkrantz II*) as well as the Court of Appeal's opinion in the present case.

## 1

At petitioner's first parole hearing in December 1994, the Board set his minimum parole eligibility date as January 23, 1996. At a parole suitability hearing in June 1996, the Board's hearing panel found petitioner suitable for parole and recommended a release date. Its decision relied upon the circumstances that petitioner (1) had no juvenile record or criminal history aside from the offense of which he was convicted, (2) had a stable social history, (3) excelled in school, (4) had no involvement with drugs or alcohol and no gang involvement, (5) required only one more semester of classes before receiving a bachelor of arts degree, (6) participated in extensive self-help and therapy programming to understand why he had reacted violently in committing the offense, (7) committed the crime as a result of significant stress in his life, (8) had realistic parole plans, including a job offer and very strong family support, (9) engaged in no disciplinary misconduct while in prison, (10) showed signs of remorse, and (11) accepted responsibility for his criminal behavior. In addition, the trial judge and the district attorney had expressed support for granting parole to petitioner, and the psychological report prepared for the Board was positive.

A review panel of the Board disapproved the hearing panel's recommendation of a release date, however, and identified issues in need of further

review. For example, the review panel observed that petitioner's version of the altercation at the beach house differed from the version of events recounted by his brother Joey, suggesting that petitioner might have attempted to portray the events in a light more favorable to himself. In addition, the review panel stated that investigatory reports suggested petitioner had planned the killing and had threatened Redman the day before the murder, and that after the murder petitioner had threatened Redman's family and had stated to another individual that petitioner "did society a favor."

In December 1996, a rehearing panel of the Board also found that petitioner was not suitable for parole. This panel considered a letter from the investigating homicide detective, which addressed some of the points in the review panel's decision and reflected the detective's view that petitioner should be paroled. The detective stated that when investigating the crime, he had found a knife on Redman's body. The detective also expressed his opinion that statements by Redman's mother, relating that petitioner had made threatening phone calls before his arrest, were unreliable. The decision of the rehearing panel to deny parole was based primarily upon its assessment that petitioner's offense was committed in a dispassionate and calculated manner, and that petitioner therefore would pose an unreasonable risk of danger to society if released.

Another parole suitability hearing was conducted in August 1997. In addition to information received at the prior hearings, the Board considered a current recommendation for parole from petitioner's correctional counselor, a psychological evaluation prepared for the Board that was favorable to petitioner, several letters of support, and information indicating that the district attorney was not opposed to parole. The Board again concluded that petitioner was not suitable for parole—despite positive factors similar to those supporting the June 1996 finding of parole suitability—because of the circumstances of the offense and because petitioner had not participated sufficiently in beneficial self-help and therapy programming.

The next parole hearing was held in August 1998. In a progress report, petitioner's conduct in prison was described as exceptional. By a vote of two to one, petitioner's request for a finding of parole suitability again was denied on the ground that the offense was carried out in a manner that exhibited a callous disregard for the life and suffering of another, and that petitioner therefore would pose an unreasonable risk of danger to society if released.

Meanwhile, petitioner had filed a petition for writ of habeas corpus seeking review of the parole suitability decisions rendered by the Board in

December 1996 and August 1997. In April 1999, the superior court issued an order granting the petition. The court observed that the Board had denied parole primarily because it determined that the offense was dispassionate, calculated, and carried out in a manner that exhibited a callous disregard for human life. According to the court, these findings were inconsistent with the evidence and with the jury's implicit findings in the prior criminal action that petitioner did not plan, premeditate, or deliberate the murder. The superior court's order stated that unless evidence of changed circumstances or new information was presented to the Board, the Board was required to set a parole date for petitioner commensurate with his conviction for second degree murder—and not with the offense of first degree murder. The trial court also found that two commissioners who had participated in the Board's parole decision were biased against petitioner and should not participate in the parole hearing. The Board appealed from the superior court's April 1999 order granting the petition for writ of habeas corpus.

While the appeal was pending, the Board complied with the superior court's order and conducted a parole suitability hearing in September 1999. The Board considered current letters in support of petitioner from the trial judge who presided over his criminal trial, from a captain in the sheriff's department homicide division, from the investigating deputy, and from Redman's grandmother. The panel nonetheless found petitioner unsuitable for parole, again determining that the positive aspects of petitioner's behavior did not outweigh the circumstance that the offense was carried out in an especially cruel or callous manner, in a dispassionate or calculated manner (such as an execution-style murder), and in a manner demonstrating an exceptionally callous disregard for human suffering. Nevertheless, believing that the superior court's order required it to set a parole date, the Board granted parole but declined to set a release date pending an opportunity for the Governor to exercise his authority to review the decision.

In November 1999, the Governor invoked his authority pursuant to article V, section 8(b), to reverse the Board's decision to grant parole. The Governor stated that the Board's finding of suitability was based solely upon the superior court's order, which then was still pending on appeal.[2]

In January 2000, the superior court ordered the Board to hold a new suitability hearing within 60 days, to find petitioner suitable for parole, and to set a parole date commensurate with his conviction for second degree murder. The Board filed a petition for writ of mandate seeking to set aside the superior court's order. The Court of Appeal issued an order to show

[2]The propriety of the Governor's November 1999 decision reversing the Board's decision granting parole is not before us in the present case.

cause and consolidated the writ proceeding with the Board's appeal from the April 1999 order of the superior court.

In *Rosenkrantz II, supra,* 80 Cal.App.4th 409, the Court of Appeal affirmed the superior court's April 1999 order requiring the Board to set a parole date for petitioner commensurate with his conviction of second degree murder, unless new information was presented to the Board. The appellate court determined that the factual determinations underlying the Board's finding of parole unsuitability were not supported by any evidence. For example, the Court of Appeal found no evidence that petitioner displayed an exceptionally callous disregard for human suffering or that his crime involved an execution-style murder. Like the superior court, the Court of Appeal relied in part upon the circumstance that petitioner had been acquitted of first degree murder. The Court of Appeal also found there was no evidence indicating that petitioner required additional therapy in order to cope with stress in a nondestructive manner or not to pose a threat to others. With regard to the Board's writ petition challenging the superior court's order requiring the Board to find petitioner suitable for parole, the appellate court considered the matter not ripe for decision, because the Board had not yet "satisfied the spirit" of the superior court's April 1999 order requiring a new suitability hearing. (*Id.* at p. 427.) The Court of Appeal ordered the Board "to schedule and commence a new suitability hearing . . . and to render a new determination in strict accordance with both the letter and the spirit of the views expressed in this opinion." (*Id.* at p. 429.) In the course of its decision in *Rosenkrantz II,* the Court of Appeal emphasized "that the superior court will retain jurisdiction over this matter, and that it will have the power to enforce this order as well as its own orders, by contempt or by such other means as it deems appropriate under the circumstances." (*Id.* at p. 428.)

2

We finally summarize the most recent proceedings that directly gave rise to the present dispute.

In accordance with the decision in *Rosenkrantz II, supra,* 80 Cal.App.4th 409, the Board held a new parole suitability hearing in June 2000. At this hearing, a representative of the district attorney's office stated that the district attorney now was opposed to parole. In addition, letters from the sheriff's department expressed opposition to parole, as did a letter written by the victim's father. The hearing panel found, among other things, that petitioner had committed the crime as the result of significant stress in his life, that he had shown remorse and had accepted responsibility for his

crime, and that his most recent psychological report demonstrated that he presented a very low risk for future violence and that he clearly was not a criminally oriented individual. *The Board found petitioner suitable for parole* and determined that he would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison. *The Board made clear, however, that had it not been constrained by the order of the superior court, it would have reached a different decision.*

In October 2000, again exercising his authority pursuant to article V, section 8(b), the Governor reversed the Board's finding of suitability. In a 12-page written decision, which we shall describe in more detail below, the Governor stated that in his view petitioner would pose a significant risk of danger to society if released from prison. The Governor determined that the murder committed by petitioner was not a spontaneous crime, but rather was preceded by "a full week of careful preparation, rehearsal and execution." The Governor stated that the stress petitioner experienced regarding the disclosure of his sexual orientation "does not minimize the viciousness of this murder." Furthermore, according to the Governor, petitioner demonstrated a lack of remorse by affirming his violent act after the crime was committed, attempting to mitigate his role in the crime, portraying himself as a victim, lying about numerous aspects of the murder, and not taking full responsibility for the crime. The Governor stated that petitioner "should be grateful that he was not convicted of first degree murder," because there appears to have been ample evidence to support such a conviction. The Governor concluded that petitioner's good behavior and accomplishments in prison did not outweigh the circumstances of the crime, and that petitioner "has not served sufficient time in prison for this very serious crime."

In November 2000, petitioner filed an amended petition for writ of habeas corpus in which he challenged the Governor's reversal of the Board's decision granting parole. The Governor filed a motion to disqualify (Code Civ. Proc., § 170.6) the Honorable Kathryn Stoltz, who had presided over the prior habeas corpus proceeding in which petitioner had been granted relief. Judge Stoltz struck the challenge as untimely, but the Court of Appeal reversed that order. The appellate court, in an unpublished, divided decision (*Davis v. Superior Court (Rosenkrantz)* (Feb. 22, 2001, B146421) (*Rosenkrantz III*)), determined that petitioner's amended petition constituted an entirely new proceeding in which the Governor had appeared as a party for the first time and in which petitioner challenged the Governor's independent parole decision. According to the Court of Appeal, the proceeding did not constitute a continuation of the earlier proceedings in which the superior court had reviewed the Board's parole decision. Therefore, the appellate court directed the superior court to grant the Governor's motion to disqualify

the judge pursuant to Code of Civil Procedure section 170.6 and to assign the case to another judge for all purposes.

On remand before a different judge, the superior court held an evidentiary hearing and, in June 2001, granted the petition for writ of habeas corpus. The trial court determined that due process of law required the Governor's parole decision to be supported by some evidence, and that the materials reviewed by the Governor did not include any evidence supporting his decision. The trial court therefore ordered that petitioner be released on parole forthwith. As an alternative ground for its order, the superior court found that petitioner was denied an individualized determination of his suitability for parole, because the Governor had adopted an unconstitutional blanket policy of denying parole to prisoners serving indeterminate-term-to-life sentences. This policy, the court determined, indicated that the Governor was biased against murderers as a class.[3]

The Governor appealed from the superior court's decision and sought a stay of the order requiring petitioner's release. The Court of Appeal denied the request for a stay, but this court stayed the order pending the final determination of the Governor's appeal. In another divided decision, the Court of Appeal affirmed the superior court's order granting the petition for writ of habeas corpus and requiring petitioner's release on parole. (*In re Rosenkrantz* (2002) 95 Cal.App.4th 358 [116 Cal.Rptr.2d 69], review granted May 1, 2002, S104701 (*Rosenkrantz IV*).) The majority opinion in *Rosenkrantz IV* concluded that the superior court possessed jurisdiction to review the Governor's decision in order to determine whether it was supported by some evidence. The appellate court rejected the Governor's contention that the separation of powers doctrine precluded the judicial branch from reviewing his decision to reverse the Board's determination that petitioner should be paroled. The court further determined that such a decision by a Governor must be based upon the same record that was before the Board and upon the same factors the Board was required to consider. Because the Court of Appeal had held in *Rosenkrantz II* that there was no evidence supporting the Board's finding that petitioner was not suitable for parole, the appellate court concluded that the doctrine of law of the case established the absence of any evidence supporting the Governor's finding that petitioner was not suitable for parole. Accordingly, the Court of Appeal held in *Rosenkrantz IV* that the Governor's decision did not afford petitioner due process of law.

---

[3]Although the superior court ruled in petitioner's favor on the above two issues, that court rejected petitioner's separate claim that the Governor's exercise of the review authority granted by article V, section 8(b), constituted a violation of the ex post facto clause. As we shall explain, although petitioner did not timely present the ex post facto claim in the proceedings now pending before us, we address this issue below. (See *post*, at pp. 636-652.)

The author of the majority opinion of the Court of Appeal decision in *Rosenkrantz IV* also authored a concurring opinion stating that sufficient evidence had been presented to support the superior court's finding that the Governor had adopted a policy of not granting parole to individuals convicted of murder and sentenced to an indeterminate term. The concurrence agreed with the trial court that this policy precluded the individualized determination of parole suitability required by due process of law. With regard to the application of the law of the case doctrine, the concurring opinion expressed the view that the underlying habeas corpus proceeding was the same proceeding considered in *Rosenkrantz II*, despite the addition of the Governor as a party.

The dissenting opinion in *Rosenkrantz IV* concluded that the law of the case doctrine did not apply, because, as established in *Rosenkrantz III*, the habeas corpus proceeding under review constituted an entirely new proceeding in which the Governor had appeared for the first time. The dissent further determined that even if the law of the case doctrine applied under the circumstances, the statements in *Rosenkrantz II* that there was no evidence supporting a finding of parole unsuitability were dicta. Furthermore, the dissent disagreed with the conclusion in *Rosenkrantz II* that the circumstances of the commitment offense that would have supported a first degree murder conviction could not be considered in determining suitability for parole. The dissenting opinion found that the Governor properly had considered the relevant factors and that his decision was supported by some evidence. Finally, the dissent found the evidence insufficient to support the trial court's finding that the Governor has a blanket policy of denying parole to murderers.

We granted the Governor's petition for review and granted petitioner's motion to expedite the appeal. Our stay of the order that required petitioner's release remains in effect.

## II

Before addressing the principal issue upon which we granted review—i.e., whether a decision issued by the Governor denying or granting parole is subject to judicial review, and, if so, under what standard—we consider a separate issue that petitioner belatedly has brought before the court. Although petitioner did not timely raise the point in his answer to the Governor's petition for review, in his brief on the merits filed in this court petitioner requests that we nonetheless consider a threshold question that logically precedes the question of whether the Governor's decision is subject to judicial review—namely, whether it was constitutionally permissible for

the Governor to have exercised the review authority afforded by article V, section 8(b), in this case *at all*. Petitioner argues in this regard that because he committed the underlying offense *in 1985*, prior to the adoption of article V, section 8(b), *in 1988*, the Governor's denial of parole pursuant to the review authority afforded by article V, section 8(b), constitutes a violation of the ex post facto provisions of the federal and state Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) ▉ Petitioner maintains that application of article V, section 8(b), improperly permitted the Governor to extend petitioner's incarceration retroactively (by denying parole) after the Board—which had the final say on parole prior to the adoption of article V, section 8(b)—had decided in favor of granting parole.

Although we could decline to address the ex post facto claim because the issue was not timely presented (see Cal. Rules of Court, rule 28(e)), we conclude that it is appropriate to exercise our discretion to resolve this issue, because the ex post facto question is an important one that affects not only the present case but numerous other pending matters, and because we conclude that the issue properly may be decided as a matter of law. Under the circumstances, we believe that the administration of justice would not be served by leaving this issue unresolved at this juncture. At our request, the parties have filed supplemental briefs addressing the ex post facto question.

A

At the outset, we observe that petitioner is not in the best position to claim that article V, section 8(b), has worked unfairly to his disadvantage by permitting the *Governor* to substitute *his* determination as to petitioner's suitability for parole for the evaluation of petitioner's suitability reached *by the Board*. As the factual recitation set forth above indicates, in this case the Board, exercising its own judgment and discretion, determined—largely on the basis of the nature and circumstances of the offense—that petitioner was *not* yet suitable for parole. It was only under the compulsion of the appellate court's decision in *Rosenkrantz II, supra*, 80 Cal.App.4th 409, finding that the Board's decision denying parole was not supported by any evidence and ordering the Board—*under the threat of contempt*—to grant parole, that the Board ultimately issued a decision granting parole to petitioner.[4] Accordingly, from a realistic perspective, petitioner cannot maintain persuasively that in this instance article V, section 8(b), has resulted in the denial of

[4]The circumstance that the parole board acted under compulsion is underscored by the appellate court's inclusion of the following unusual (and, in our view, questionable) language in its decision in *Rosenkrantz II*, threatening the members of the parole board with contempt: "We anticipate that the Board will find Rosenkrantz suitable for release on parole and that a parole date will be set. We emphasize, however, that the superior court will retain jurisdiction over this matter, and that it will have the power to enforce this order as well as its own orders,

parole of an individual whom the Board, in the exercise of its independent judgment, has determined is suitable for parole.

## B

The flaw in petitioner's ex post facto claim, however, is not confined to the particular circumstances of this case. Article V, section 8(b), was added to the California Constitution in 1988, and for nearly a decade and a half California Governors have exercised the authority afforded by this provision to reverse parole decisions involving well over 100 murderers, virtually all of whom committed their crimes prior to the adoption of this constitutional provision.[5] Were petitioner's ex post facto argument correct, every gubernatorial reversal of a Board decision granting parole in these cases would have been constitutionally flawed. It would be surprising, to say the least, to discover such a fundamental constitutional problem at this late date. As we shall see, however, petitioner's ex post facto claim is not meritorious. The governing authorities establish that the type of procedural change implemented by article V, section 8(b)—i.e., a change that simply created a new level of review, within the executive branch, of parole decisions concerning a specified category of prisoners (thereby changing the identity of the ultimate decision maker within the executive branch for such parole decisions), but that did not change the substantive standard governing the grant or denial of parole—is *not* the type of change to which the ex post facto clause applies.

We begin with an overview of the purpose and reach of the ex post facto clause. In *People v. Frazer* (1999) 21 Cal.4th 737, 754 [88 Cal.Rptr.2d 312, 982 P.2d 180], we explained that "[t]he ban on ex post facto legislation stems from the excesses of colonial rulers in using retrospective legislation as a means of political warfare and retribution. [Citations.] It ensures the citizenry has 'fair warning' of the conduct proscribed by law and of the penalties imposed for violating those proscriptions. [Citations.] In this way, individuals are free to act in reliance on the law without fear that their conduct will be made punishable in a 'vindictive' or 'arbitrary' fashion after it has occurred. [Citation.]" (Fn. omitted.)

In *Collins v. Youngblood* (1990) 497 U.S. 37 [110 S.Ct. 2715, 111 L.Ed.2d 30] (*Collins*), the United States Supreme Court undertook a comprehensive

---

by contempt or by such other means as it deems appropriate under the circumstances." (*Rosenkrantz II, supra,* 80 Cal.App.4th 409, 428.)

[5] An article in the September 24, 2002, edition of the San Francisco Daily Journal reported that, as of that date, Governor Davis had reversed 117 decisions granting parole to convicted murderers and kidnappers. (Blumberg, *Panel Finds No Objection to Governor's Parole Policy,* S.F. Daily J. (Sept. 24, 2002) p. 1.) An article in the Los Angeles Times reported that Governor Wilson rejected 20 parole recommendations during his tenure. (Lesher, *Davis Takes Hard Line on Parole for Killers,* L.A. Times (Apr. 9, 1999) p. A-3.)

review of the history and scope of the federal constitutional ex post facto clause in evaluating an ex post facto challenge to a change in Texas law, enacted after the crime at issue was committed, that for the first time authorized a court in that state to reform an improper jury verdict in a criminal proceeding rather than require a remand for a new trial. In analyzing the ex post facto claim in *Collins*, the high court observed that early opinions of the United States Supreme Court accurately had explained that the phrase " '*ex post facto* law' was a term of art with an established meaning at the time of the framing of the Constitution. [Citations.]" (*Id.* at p. 41 [110 S.Ct. at p. 2718].) As the court in *Collins* noted (*id.* at pp. 41-42 [110 S.Ct. at pp. 2718-2719]), that established meaning was first set forth in Justice Chase's opinion in *Calder v. Bull* (1798) 3 U.S. (3 Dall.) 386, 390-391 [1 L.Ed. 648, 651], and later was summarized in *Beazell v. Ohio* (1925) 269 U.S. 167, 169-170 [46 S.Ct. 68, 68, 70 L.Ed. 216]: "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute [1] which punishes as a crime an act previously committed, which was innocent when done; [2] which makes more burdensome the punishment for a crime, after its commission, or [3] which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*."

The court in *Collins* acknowledged that there was some disparity in United States Supreme Court decisions applying the ex post facto clause over the years, and that on occasion the court had interpreted the clause not only as directed at those types of legislative changes that fell within the specific categories set forth in *Calder* and *Beazell* but more broadly as encompassing any change that " 'alters the situation of a party to his disadvantage' " (*Collins, supra,* 497 U.S. at p. 46 [110 S.Ct. at p. 2721]) or that deprives a criminal defendant of a " 'substantial right involved in his liberty.' " (*Id.* at p. 47 [110 S.Ct. at pp. 2721-2722], quoting *Kring v. Missouri* (1883) 107 U.S. 221 [2 S.Ct. 443, 27 L.Ed. 506] (*Kring*), and *Thompson v. Utah* (1898) 170 U.S. 343 [18 S.Ct. 620, 42 L.Ed. 1061] (*Thompson*).) Finding that the broader characterization of the ex post facto clause reflected in *Kring* and *Thompson* was inconsistent with the origin and intended scope of this constitutional provision, the court in *Collins* explicitly overruled *Kring* and *Thompson* (*Collins, supra,* 497 U.S. at pp. 50, 52 [110 S.Ct. at pp. 2723, 2724]), and reaffirmed that "[t]he *Beazell* formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause." (*Id.* at p. 43 [110 S.Ct. at p. 2719].) The court in *Collins* then restated the scope of the prohibition established by the ex post facto clause more concisely as follows: "Legislatures may not *retroactively alter the definition of crimes or increase the punishment for criminal acts.*" (*Ibid.*, italics added.) ▪ Since its 1990 decision in *Collins*, the high court consistently has adhered to its

holding in *Collins* that the ex post facto clause is directed only to changes in law that (1) retroactively alter the definition of a crime or (2) retroactively increase the punishment for criminal acts. (See, e.g., *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 506, fn. 3 [115 S.Ct. 1597, 1602, 131 L.Ed.2d 588] (*Morales*) ["After *Collins*, the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable."]; *Lynce v. Mathis* (1997) 519 U.S. 433, 441 [117 S.Ct. 891, 895-896, 137 L.Ed.2d 63].)[6]

 In this case, petitioner does not argue that the enactment of article V, section 8(b), "altered the definition" of any crime, but he asserts that the provision "increased the punishment" for his offense. Under the ordinary meaning of this language, however, it cannot reasonably be said that the adoption of article V, section 8(b), *increased the punishment* for petitioner's offense. At the time petitioner committed the underlying offense, second degree murder was punishable by a sentence of imprisonment from 15 years to life (with the possibility of parole), and after the adoption of article V, section 8(b), the term of petitioner's sentence remains imprisonment from 15 years to life (with the possibility of parole). Furthermore, article V, section 8(b), did not make any changes in the substantive standard that governs the determination of petitioner's suitability for parole; indeed, article V, section 8(b), explicitly provides that the Governor, in reviewing the parole board's decision, is to apply *the same factors as the Board*. The only change effected by article V, section 8(b), is the institution of an additional level of discretionary review of the Board's decision granting or denying parole, resulting merely in a change in the identity of the entity or official within the executive branch that may make the ultimate decision on parole. Prior to the adoption of article V, section 8(b), the only reasonable expectation that an individual in petitioner's position would have had with regard to punishment was that he or she would receive a sentence of 15 years to life imprisonment and that, after serving the minimum term, he or she would be entitled to have a public official exercise discretion with regard to his or her suitability for parole under then existing standards. Such an individual in petitioner's position had no reasonable expectation regarding the identity of the person or persons who would exercise discretion in evaluating his or her suitability

---

[6]Past cases establish that the ex post facto clause set forth in the California Constitution (Cal. Const., art. I, § 9) embodies the same protection afforded by the federal ex post facto clause. (See, e.g., *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 295-297 [279 Cal.Rptr. 592, 807 P.2d 434]; *People v. Frazer, supra,* 21 Cal.4th 737, 754, fn. 15.) Our decision in *Frazer* makes it clear that the analysis in *Collins* regarding the proper scope of the federal ex post facto clause applies as well to the scope of the California ex post facto clause. (See *Frazer, supra,* 21 Cal.4th at p. 754 et seq. [analyzing and applying *Collins*].)

for parole, or that the person or persons who would make such a decision would not change over time. Accordingly, under the ordinary meaning of the controlling language in *Collins*, it appears clear that the application of the procedure set forth in article V, section 8(b), to an individual who committed a criminal offense prior to its enactment does not *increase the punishment* for such crime.

Petitioner has not cited any case in which a provision comparable to article V, section 8(b), has been held to constitute an increase in punishment for purposes of the ex post facto clause. In past decisions, the United States Supreme Court has found the ex post facto clause applicable to (1) a provision that increased the minimum sentence a trial court could impose for an offense (*Lindsey v. Washington* (1937) 301 U.S. 397 [57 S.Ct. 797, 81 L.Ed. 1182]), (2) a provision that altered, to a prisoner's detriment, the substantive standard that was applied in determining the "gain time" credit that a prisoner could earn in prison to reduce his term of imprisonment (*Weaver v. Graham* (1981) 450 U.S. 24 [101 S.Ct. 960, 67 L.Ed.2d 17]), (3) a provision that increased the "presumptive sentencing range" for an offense committed prior to its adoption (*Miller v. Florida* (1987) 482 U.S. 423 [107 S.Ct. 2446, 96 L.Ed.2d 351]), and (4) a provision that retroactively cancelled "overcrowding credits" that had been awarded to a prisoner, resulting in the reimprisonment of the prisoner after he had been released from prison (*Lynce v. Mathis, supra*, 519 U.S. 433). The high court, however, never has found a provision similar to article V, section 8(b), to constitute the type of measure to which the ex post facto clause applies.

Furthermore, petitioner's claim that the ex post facto clause prohibits the Governor from exercising the authority afforded by article V, section 8(b), in any case in which a prisoner committed the underlying offense prior to the adoption of that provision, has been squarely and uniformly rejected by each of the prior California and federal decisions that have addressed the issue.

Just a few years after article V, section 8(b), was added to the state Constitution, the same ex post facto claim that is advanced by petitioner in this case was presented to the Court of Appeal in *In re Arafiles* (1992) 6 Cal.App.4th 1467 [8 Cal.Rptr.2d 492] (*Arafiles*), certiorari denied (1993) 507 U.S. 934 [113 S.Ct. 1321, 122 L.Ed.2d 707]. In analyzing the ex post facto contention, the court in *Arafiles* observed that "[a]pplication of section 8(b) to [petitioner] has not changed and cannot change the quantum of punishment annexed to his crime when he was convicted. Indeed, nothing within section 8(b) empowers the Governor to increase petitioner's sentence. Section 8(b) simply allows for an additional level of discretionary review of parole decisions regarding murderers serving an indeterminate life sentence.

Such an adjustment to the procedure for reviewing parole release decisions is collateral to the penalty itself. Section 8(b) is not ex post facto as applied to petitioner." (6 Cal.App.4th at pp. 1484-1485.)

The court in *Arafiles* found support for its conclusion in the United States Supreme Court's decision in *Mallett v. North Carolina* (1901) 181 U.S. 589 [21 S.Ct. 730, 45 L.Ed. 1015] (*Mallett*). In *Mallett*, two defendants who had been convicted in a state criminal trial had appealed their convictions to the state appellate court, which had ruled in their favor and ordered a new trial. At the time the defendants committed their offense, the People had no right to appeal from an appellate court decision granting a new trial to a criminal defendant, but—while the appeal in *Mallett* was pending—legislation was enacted granting the prosecution the right to appeal such a decision of the lower appellate court to the state supreme court. In *Mallett*, after the prosecutor exercised this right, the state supreme court reversed the lower appellate court decision and remanded the case to the trial court for execution of the original sentence. The defendants then sought relief in the United States Supreme Court, contending that the new state law granting the prosecution the right to appeal to the state supreme court violated the ex post facto clause when applied to a defendant who committed his crime before the new law was enacted.

In its decision in *Mallett, supra,* 181 U.S. 589, the United States Supreme Court emphatically rejected the defendants' ex post facto claim, explaining that, as stated by the North Carolina Supreme Court, " 'defendants had no "vested rights" in the remedies and methods of procedure in trials for crime. They cannot be said to have committed this crime relying upon the fact that there was no appeal given the state in such cases.' " (*Id.* at p. 593 [21 S.Ct. at p. 732].) " 'So far as mere modes of procedure are concerned a party has no more right, in a criminal than in a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place.' " (*Id.* at pp. 596-597 [21 S.Ct. at p. 733].) Thus, the high court concluded in *Mallett* that the type of procedural provision involved in that case—i.e., the addition of a new level of review of a decision favorable to a criminal defendant that could work to the defendant's detriment (and that actually did operate to the defendants' detriment in *Mallett* itself)—was not the type of procedural change that fell within the aegis of the ex post facto clause.

After discussing the high court's holding in *Mallett,* the court in *Arafiles* concluded that "[i]f allowing for higher court review of intermediate appellate court decisions does not violate ex post facto proscriptions, we fail to see how allowing for executive review of parole decisions can be otherwise." (*Arafiles, supra,* 6 Cal.App.4th 1467, 1486.)

Four years after the Court of Appeal rendered its decision in *Arafiles,* an identical ex post facto challenge to article V, section 8(b), came before the federal Ninth Circuit Court of Appeals in *Johnson v. Gomez* (9th Cir. 1996) 92 F.3d 964 (*Johnson*), certiorari denied (1997) 520 U.S. 1242 [117 S.Ct. 1848, 137 L.Ed.2d 1050]. The court in *Johnson,* after reviewing a number of leading ex post facto cases decided by the United States Supreme Court— including *Mallett, supra,* 181 U.S. 589, *Dobbert v. Florida* (1977) 432 U.S. 282 [97 S.Ct. 2290, 53 L.Ed.2d 344] (*Dobbert*), and *Collins, supra,* 497 U.S. 37[7] —agreed with *Arafiles* that application of article V, section 8(b), to a prisoner who had committed his or her offense prior to the enactment of that provision did not violate the ex post facto clause.

In the course of its decision, the court in *Johnson* addressed the contention that the reasoning of the United States Supreme Court's then recent ex post facto decision in *Morales, supra,* 514 U.S. 499, supported the conclusion that article V, section 8(b), could not be applied retroactively on the ground that this new constitutional provision was intended to, and in practice would, increase the amount of time a prisoner would remain in prison. In rejecting this contention, the court in *Johnson* explained: "Johnson argues that, unlike the administrative convenience purpose of the law in *Morales,* the purpose and effect of the law here is to lengthen prison terms by making it more difficult for convicted murderers with indeterminate sentences to be released on parole. However, the law itself is neutral inasmuch as it gives the governor power to either affirm or reverse a [Board's] granting or denial of parole. Moreover, the governor must use the same criteria as the [Board]. The law, therefore, simply removes final parole decisionmaking authority from the [Board] and places it in the hands of the governor. We cannot materially distinguish this change in the law from that at issue in *Mallett v. North Carolina . . . .* In *Mallett,* the Court found no ex post facto violation where the new law allowed for higher court review of intermediate court decisions, even though the petitioner would have been entitled to a final intermediate court decision at the time of his crime. [Citation.] We therefore conclude that the application of [article V, section 8(b)] to authorize the governor's review of Johnson's grant of parole did not violate the Ex Post Facto Clause." (*Johnson, supra,* 92 F.3d at p. 967.)

In sum, the courts in *Arafiles, supra,* 6 Cal.App.4th 1467, and in *Johnson, supra,* 92 F.3d 964, after reviewing the governing United States Supreme

---

[7]The *Mallett* and *Collins* decisions have been described above. (See, *ante,* at pp. 638-639, 642.) In *Dobbert,* the high court held that a change in state law that gave the trial court and the state's highest court, rather than the jury, the final say on whether the death penalty was to be imposed in a particular case, could be applied retroactively to a defendant who committed his offense prior to the enactment of the new provision, without violating the ex post facto clause. (*Dobbert, supra,* 432 U.S. at pp. 292-294 [97 S.Ct. at pp. 2297-2299].)

Court opinions interpreting the ex post facto clause, found that the type of procedural change effected by the adoption of article V, section 8(b)—i.e., the addition of a new level of review of parole decisions and a change in the identity of the ultimate decision maker, without a change in any substantive standard—did not constitute an "increase in punishment" and was not the type of procedural change that fell within the prohibition of the ex post facto clause.[8]

Although the decisions in *Arafiles* and *Johnson* never have been overruled or questioned, petitioner contends that both decisions are inconsistent with the United States Supreme Court's more recent decision in *Garner v. Jones* (2000) 529 U.S. 244 [120 S.Ct. 1362, 146 L.Ed.2d 236] (*Garner*) and for that reason should not be followed. As we shall explain, however, the high court's decision in *Garner* did not involve a legislative or constitutional provision even remotely similar to article V, section 8(b), and nothing in *Garner* questions either the validity of the *Arafiles* and *Johnson* decisions themselves or the high court decisions upon which the opinions in *Arafiles* and *Johnson* relied. Accordingly, we conclude that petitioner's reliance upon *Garner* is misplaced.

---

[8]Although petitioner has not cited or relied upon the case, we are aware of one state court decision that holds that a provision requiring gubernatorial approval of a parole board's grant of parole may not apply retroactively in light of the ex post facto doctrine. In *Gluckstern v. Sutton* (1990) 319 Md. 634 [574 A.2d 898] (*Sutton*), certiorari denied *sub nom. Henneberry v. Sutton* (1990) 498 U.S. 950 [111 S.Ct. 369, 112 L.Ed.2d 331], the Maryland Court of Appeals held that, under the federal and Maryland ex post facto clauses (which Maryland cases had interpreted to have the same meaning (574 A.2d at p. 913)), a statutory change requiring gubernatorial approval of an administrative board's grant of parole to a prisoner who had been sentenced to a term of life imprisonment could not be applied to an individual who had committed his offense prior to the enactment. In reaching this conclusion, however, the court in *Sutton* relied prominently upon the line of United States Supreme Court cases, beginning with *Kring, supra*, 107 U.S. 221, that had interpreted the ex post facto clause broadly to apply to " ' "any law passed after the commission of an offense which . . . 'in relation to that offense, *or its consequences*, alters the situation of a party to his disadvantage.' " ' " (*Sutton, supra*, 574 A.2d at p. 913, quoting *Kring, supra*, 107 U.S. at p. 235 [2 S.Ct. at p. 455] [italics added in *Sutton*].) The decision in *Sutton* was decided on June 7, 1990, two weeks prior to the United States Supreme Court's decision in *Collins, supra*, 497 U.S. 37, which was rendered on June 21, 1990. As discussed above (*ante*, p. 639), in *Collins* the United States Supreme Court specifically overruled *Kring* and disapproved the broad statement of the ex post facto clause enunciated in that decision. (*Collins, supra*, 497 U.S. at p. 50 [110 S.Ct. at p. 2723].) Because the court in *Sutton* applied an expansive version of the ex post facto clause that subsequently has been disavowed by both the United States Supreme Court and this court (see *People v. Fraser, supra*, 21 Cal.4th 737, 754-765), we believe the holding of *Sutton* is fatally flawed. (See also *Alston v. Robinson* (D.Md. 1992) 791 F.Supp. 569, 593, fn. 46, affd. *sub nom. Doyle v. Robinson* (4th Cir. 1994) 19 F.3d 10 ["*Sutton* constitutes an expansive reading of the *ex post facto* clause which the Supreme Court would seemingly no longer sanction"].) Moreover, to the extent that the decision in *Sutton* does not depend upon the applicability of the broad ex post facto standard articulated in *Kring, supra*, 107 U.S. at p. 235 [2 S.Ct. at pp. 454-455], we nonetheless find the decision unpersuasive, for the reasons discussed above.

The decision in *Garner, supra,* 529 U.S. 244, involved an interpretation and application of the high court's earlier decision in *Morales, supra,* 514 U.S. 499, and a review of the *Morales* decision is helpful to a proper understanding of the court's subsequent decision in *Garner.* The controversy in *Morales* arose out of the application of a California statute that authorized the Board, in the case of prisoners who had been convicted of more than one murder, to decrease the frequency with which parole suitability hearings for such prisoners were to be held—from once every year to as infrequently as once every three years—if the Board found, based upon the circumstances of the particular prisoner, that it was not reasonable to expect that parole would be granted at an earlier hearing. The issue before the United States Supreme Court in *Morales* was whether the new California statute could be applied to prisoners who had committed their crimes before the enactment of the new statute, or whether such an application of the new statute was barred by the ex post facto clause.

In analyzing the issue, the court in *Morales* began by observing that in *Collins, supra,* 497 U.S. 37, 41 [110 S.Ct. 2715, 2718-2719], the court had reaffirmed that "the *Ex Post Facto* Clause incorporated 'a term of art with an established meaning at the time of the Constitution' " (*Morales, supra,* 514 U.S. at p. 504 [115 S.Ct. at p. 1601]) and that, in accordance with this original understanding, "the Clause is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' " (*Ibid.*) The court in *Morales* then explained that the California statute at issue clearly effected no change in the definition of a prisoner's crime, and that the only question was whether the statute increased the punishment attached to the prisoner's offense.

In contending that the statute did increase his punishment, the defendant in *Morales* relied upon the line of Supreme Court cases, noted above, which held that a legislature could not increase or stiffen the standard of punishment applicable to crimes that have already been committed. (See *Lindsey v. Washington, supra,* 301 U.S. 397 [ex post facto clause prohibits application of new statute increasing the minimum term that could be imposed for offense]; *Weaver v. Graham, supra,* 450 U.S. 24 [ex post facto clause prohibits a state from retroactively altering the substantive "formula" used to calculate a defendant's time of confinement]; *Miller v. Florida, supra,* 482 U.S. 423 [same].) The court in *Morales,* however, found those cases inapposite, pointing out that the statute at issue in *Morales* did not affect a prisoner's sentence, "left unchanged the substantive formula for securing any reductions" to the sentencing range, and "had no effect on the standards for fixing a prisoner's initial date for 'eligibility' for parole . . . or for determining his 'suitability' for parole and setting his release date . . . ." (*Morales, supra,* 514 U.S. at p. 507 [115 S.Ct. at p. 1602].)

The court in *Morales, supra*, 514 U.S. 499, observed that the only change made by the statute in question was to introduce "the possibility that after the initial parole hearing, the Board would not have to hold another hearing the very next year, or the year after that, if it found no reasonable probability that respondent would be deemed suitable for parole in the interim period." (*Morales, supra*, 514 U.S. at p. 507 [115 S.Ct. at p. 1602].) Although the defendant in *Morales* urged the court to hold "that the *Ex Post Facto* Clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment," the court rejected that contention, explaining that under such an approach "the judiciary would be charged under the *Ex Post Facto* Clause with the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures, *including such innocuous adjustments as changes to the membership of the Board of Prison Terms* . . . ." (*Id.* at p. 508 [115 S.Ct. at pp. 1602-1603], italics added.)

Observing that "[w]e have previously declined to articulate a single 'formula' for identifying those legislative changes that have a sufficient effect on substantive crimes or punishments to fall within the constitutional [ex post facto] prohibition" (*Morales, supra*, 514 U.S. at p. 509 [115 S.Ct. at p. 1603]), the court in *Morales* concluded that it had "no occasion to do so [in that case, because the statute at issue there] create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes" (*ibid.*), inasmuch as the statute "applie[d] only to a class of prisoners for whom the likelihood of release on parole is quite remote," the Board "retain[ed] the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner," and a prisoner was not precluded from seeking an expedited hearing should he or she experience a drastic change of circumstances. (*Id.* at pp. 510-512 [115 S.Ct. at pp. 1603-1604].) Under these circumstances, the court in *Morales* held that the retroactive application of the California statute did not violate the ex post facto clause. (*Id.* at p. 514 [115 S.Ct. at pp. 1605-1606].)

As noted, the more recent decision in *Garner, supra*, 529 U.S. 244, upon which petitioner in this case heavily relies, arose in the wake of *Morales*. Like *Morales*, *Garner* involved the validity, under the ex post facto clause, of applying a new policy reducing the frequency of parole release hearings for a prisoner who committed his crime before the new policy was promulgated. In *Garner*, the Georgia Board of Pardons and Paroles was required under Georgia law initially to consider parole for an inmate serving a life term after the inmate had served seven years. At the time the prisoner in *Garner* committed his offense, the governing administrative rules required the board to reconsider parole every three years thereafter. At a time

subsequent to the prisoner's commission of his offense, the board amended its rules to provide that " '[r]econsideration of those inmates serving life sentences who have been denied parole shall take place at least every eight years.' " (*Id.* at p. 247 [120 S.Ct. at p. 1366].) In *Garner*, the issue presented was whether this change in policy constitutionally could be applied to the prisoner in that case under the ex post facto clause.

The federal court of appeals had concluded in *Garner* that the amended Georgia rule was distinguishable in material respects from the California statute upheld in *Morales*, and held that retroactive application of the new Georgia policy was barred by the ex post facto clause. (*Jones v. Garner* (11th Cir. 1999) 164 F.3d 589.) In reaching its conclusion, the court of appeals relied in part on the circumstance that the Georgia rule applied to a much broader class of prisoners—all prisoners serving a life term—than the California statute at issue in *Morales*, sweeping within its reach "many inmates who can expect at some point to be paroled" (164 F.3d at p. 594) and thus, in the appellate court's view, "seems certain to ensure that some number of inmates will find the length of their incarceration extended in violation of the *Ex Post Facto* Clause . . . ." (*Id.* at p. 595.) Further, the court of appeals emphasized that "[e]ight years is a long time" and that "[m]uch can happen in the course of eight years to affect the determination that an inmate would be suitable for parole." (*Ibid.*) Although the court of appeals recognized that the parole board policy permitted the board to reconsider a parole denial at any time upon a showing of a change in circumstances or upon the board's receipt of new information, the court of appeals found that policy insufficient because it was not embodied in a formal regulation and thus was both easily changed and not enforceable.

The United States Supreme Court granted certiorari in *Garner, supra,* 529 U.S. 244, and reversed the decision of the court of appeals. Although the high court in *Garner* acknowledged the differences between the Georgia law and the California statute at issue in *Morales*, the high court concluded that "[t]hese differences are not dispositive" and stated that "[t]he question is whether the amended Georgia Rule creates a significant risk of prolonging respondent's incarceration." (529 U.S. at p. 251 [120 S.Ct. at p. 1368].)

After describing the considerable discretion exercised by the parole board under Georgia law in determining whether a prisoner should be granted parole (*Garner, supra,* 529 U.S. at pp. 252-253 [120 S.Ct. at pp. 1368-1369]) and at the same time making clear that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause" (*id.* at p. 253 [120 S.Ct. at p. 1369]), the court in *Garner* went on to observe that "to the extent there inheres in *ex post facto* doctrine some idea of actual or constructive notice to

the criminal before commission of the offense of the penalty for the transgression [citation], we can say with some assurance that *where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised.* The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions." (*Ibid.*, italics added.)

The court in *Garner* then went on to identify what it viewed as the gist of the prisoner's claim that a reduction in the frequency of parole hearings amounted to an ex post facto violation, explaining: "*The essence of respondent's case,* as we see it, *is not that discretion* [relating to the grant of parole] *has been changed in its exercise but that, in the period between parole reviews, it* [i.e., discretion] *will not be exercised at all.*" (*Garner, supra,* 529 U.S. at p. 254 [120 S.Ct. at p. 1369], italics added.)

Addressing *that* claim—i.e., the contention that application of the new parole board policy violated the ex post facto clause because in the extended period between parole reviews the board's discretion to determine whether the prisoner was ready for parole would not be exercised at all—the court in *Garner* rejected the contention, emphasizing first that the governing regulations vested the parole board "with discretion as to how often to set an inmate's date for reconsideration, with eight years for the maximum" (*Garner, supra,* 529 U.S. at p. 254 [120 S.Ct. at p. 1369]) and, second, that "the Board's policies permit 'expedited parole reviews in the event of a change in their circumstance or where the Board receives new information that would warrant a sooner review.' " (*Ibid.*) Given these qualifications embodied within the change in policy, the court in *Garner* disagreed with the court of appeals' supposition that the new rule " 'seems certain' to result in some prisoners serving extended periods of incarceration." (*Id.* at p. 255 [120 S.Ct. at p. 1370].)

Nonetheless, the court in *Garner* left open the possibility that the petitioner in that case could establish on remand that the new policy permitting the significant postponement of parole hearing dates should be treated as an increase in punishment for purposes of the ex post facto clause. The court in *Garner* stated in this regard: "When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule. . . . In the case before us, respondent must show that as applied to his own sentence the law created a

significant risk of increasing his punishment." (*Garner, supra,* 529 U.S. at p. 255 [120 S.Ct. at p. 1370].) The court remanded the case to the lower courts for proceedings consistent with its opinion. (*Id.* at p. 257 [120 S.Ct. at p. 1371].)

Relying upon the high court's language in *Garner* quoted above, petitioner contends that the question whether the application of article V, section 8(b), in the case before us violates the ex post facto clause turns upon whether "application [of the provision] will result in a longer period of incarceration than under the earlier rule." (*Garner, supra,* 529 U.S. at p. 255 [120 S.Ct. at p. 1370].) Because prior to the adoption of article V, section 8(b), a decision of the Board granting parole was final and would result in a prisoner's release from confinement, under petitioner's reading of *Garner* it would appear that application of article V, section 8(b), would violate the ex post facto clause *in every case* in which the Governor reverses a Board decision granting parole of an individual who committed his or her offense prior to the adoption of the constitutional provision, because in each such case it could be said that application of the provision would result in a longer period of incarceration for the particular prisoner than under the earlier rule. And this result would follow under petitioner's reading of *Garner* without regard to the number or percentage of times a particular Governor upheld or reversed Board decisions granting parole, because even if a Governor only rarely exercised the authority granted by article V, section 8(b), to reverse a decision granting parole, in any instance in which the Governor *did* reverse a grant of parole, it could be said that retroactive application of article V, section 8(b) "result[ed] in a longer period of incarceration than under the earlier rule." (*Garner, supra,* 529 U.S. at p. 255 [120 S.Ct. at p. 1370].) Indeed, were the language from *Garner,* upon which petitioner relies, to be viewed as establishing a new, generally applicable ex post facto standard for any legislative modification affecting the parole process, as petitioner's argument suggests, virtually any procedural change in the parole process— "including such innocuous adjustments as changes to the membership of the Board" (*Morales, supra,* 514 U.S. at p. 508 [115 S.Ct. at p. 1603]) or minor revisions of evidentiary rules in parole hearings—would fall within the prohibition of the ex post facto clause in any instance in which the procedural change resulted in the denial of parole, because in any such case it could be said that application of the new rule "will result in a longer period of incarceration than under the earlier rule." (*Garner, supra,* 529 U.S. at p. 255 [120 S.Ct. at p. 1370].)

The extremely broad scope and wide-ranging implications of petitioner's reading of *Garner* make it evident, in our view, that petitioner improperly has taken the language of *Garner* out of context and seeks to have that

language applied in a manner never intended by the high court. As we have seen, the court in *Garner* articulated the language in question as a means of determining whether application of a new provision or change in policy *that reduces the frequency at which parole hearings must be held* violates the ex post facto clause. A revision that significantly delays the date when the relevant state authority considers the parole eligibility of a prisoner is analogous to a substantive provision increasing the minimum period of time a defendant must be imprisoned before parole even may be considered. (As we have seen, the court in *Garner* adverted to this point, explaining that "[t]he essence of respondent's case, as we see it, is not that discretion has been changed in its exercise but that, in the period between parole reviews, it will not be exercised at all." (*Garner, supra,* 529 U.S. at p. 254 [120 S.Ct. at p. 1369].))

Because a provision that reduces the frequency of parole hearings is at least potentially comparable to a provision that increases the minimum term of a sentence, a measure that extends the time between parole hearings is one that reasonably might be characterized as bringing about an *increase in sentence* to which the ex post facto clause might apply. At the same time, however, the *Morales* and *Garner* decisions recognize that a rule reducing the frequency of parole hearings may contain qualifying provisions that minimize or eliminate the risk that the new policy actually will result in an increase in sentence for any prisoner. Accordingly, the court in *Garner* determined that when such a provision "does not by its own terms" (*Garner, supra,* 529 U.S. at p. 255 [120 S.Ct. at p. 1370]) create a significant risk that a prisoner's sentence will be increased, the prisoner may establish that application of the provision will violate the ex post facto clause, by demonstrating through "evidence drawn from the rule's practical implementation . . . that [the rule's] retroactive application will result in a longer period of incarceration than under the earlier rule." (*Ibid.*) There is nothing in *Garner,* however, suggesting that this standard was intended to apply to a provision, unlike a measure reducing the frequency of parole hearings, that *cannot* reasonably be viewed as falling within the category of legislative measures that *increase the punishment* for a crime.

The nature of the procedural changes embodied in article V, section 8(b), is entirely different from that of the changes involved in *Garner* and *Morales.* Article V, section 8(b), does not reduce the frequency with which parole hearings are held or parole decisions are made. The only change made by article V, section 8(b), is the institution of a new level of review of parole decisions (and a resulting change in the identity of the entity within the executive branch that makes the ultimate decision on parole suitability). As the decisions in *Arafiles* and *Johnson* indicate, the opinions of the United

States Supreme Court make it clear that *this type* of change in procedure is *not* the type of change addressed by the ex post facto clause. (See *Mallett, supra,* 181 U.S. 589; *Dobbert, supra,* 432 U.S. 282.) Nothing in *Garner* raises any question as to the continued viability of those past decisions, or suggests that a procedural provision establishing a new level of review of parole decisions within the executive branch effects an *increase in a prisoner's sentence* so as to fall within the prohibition of the ex post facto clause.[9]

In advancing his ex post facto claim, petitioner makes much of the circumstance that the record in this case establishes that the current Governor has utilized the authority afforded by article V, section 8(b), to deny parole in a large number of cases in which the Board has determined that the prisoner is suitable for parole. But the circumstance that in a significant number of cases a particular Governor may reach a judgment different from that of the Board, with regard to a prisoner's parole suitability, does not provide any support for the claim that the application of article V, section 8(b), violates the ex post facto doctrine. A similar reduction in the numbers or percentage of prisoners who are granted parole might well result from a change in the composition of the members of the Board itself, but petitioner does not—and properly could not—suggest that such a change in the Board's composition or in the person holding the office of Governor would raise any ex post facto question. As already noted, an individual who commits a crime has no reasonable expectation that his or her suitability for parole will be determined by the particular individuals who happen to

[9]Although the high court in *Collins* noted that "by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause" (*Collins, supra,* 497 U.S. at p. 46 [110 S.Ct. at p. 2721]), *Collins* did not suggest that the circumstance that a change is procedural rather than substantive has no bearing on the ex post facto question. In *Lynce v. Mathis, supra,* 519 U.S. 433—a post-*Collins* decision—the high court, in rejecting a lower court's conclusion that the revocation of a certain category of prison-time credits at issue in that case properly could be characterized as "procedural" and thus not violative of the ex post facto clause, reaffirmed the high court's pre-*Collins* pronouncement in *Dobbert, supra,* 432 U.S. 282, "that a procedural statute [that does not fall within the reach of the ex post facto clause] is one that 'simply alter[s] the methods employed in determining' whether the punishment is 'to be imposed,' rather than 'chang[ing] . . . the quantum of punishment attached to the crime.' " (*Lynce, supra,* 519 U.S. at p. 447, fn. 17 [117 S.Ct. at pp. 898-899], quoting *Dobbert, supra,* 432 U.S. at pp. 293-294 [97 S.Ct. at p. 2298].) By these terms, article V, section 8(b), clearly is procedural, for it simply alters the method employed in determining whether parole should be granted or denied.

Further, although the change in law at issue in the high court's decision in *Mallett, supra,* 181 U.S. 589, involved the enactment of a new layer of judicial review, whereas article V, section 8(b), established an additional layer of review within the executive branch, in both instances the reviewing entity or official is charged with making the same type of decision that previously was made by the entity whose decision, under the new law, is subject to review. Thus, in both *Mallett* and the present case, the creation of a new level of review did not subject the defendant to a new or more onerous substantive rule or standard, but simply changed the identity of the ultimate decision maker.

exercise authority over parole decisions at the time the individual commits the crime. Accordingly, the circumstance that the Governor, in reviewing the Board's decisions, frequently may disagree with the Board's determination that a prisoner is suitable for parole, does not transform the review procedure of article V, section 8(b), into an unconstitutional ex post facto law.[10]

In sum, we conclude that petitioner's ex post facto claim lacks merit.

## III

Having determined that the Governor's exercise of the authority afforded by article V, section 8(b), in this case did not violate the ex post facto clause, we reach the principal issue upon which we granted review.

In analyzing the Governor's contention that the judiciary is not authorized to review the merits of *a Governor's* decision affirming, reversing, or modifying a parole decision of the Board, we believe that it is helpful first to consider the proper extent of judicial review of *the Board's* decisions granting or denying parole. Although this court has not previously had occasion to address the judicial review standard that applies to a Board decision *granting* or *denying* parole, we specifically have held that the "some evidence" standard of review applies to a Board decision *rescinding* a parole date (*Powell, supra,* 45 Cal.3d 894, 903-904), and a number of recent Court of Appeal decisions have determined that this same standard also applies to a Board decision granting or denying parole. As we shall explain, we agree with the holding of these appellate decisions that under California law the factual basis for a Board decision granting or denying parole is subject to a limited judicial review under the "some evidence" standard of review.

---

[10]In his ex post facto argument, petitioner also places significant reliance on the circumstance that the ballot argument in favor of Proposition 89 emphasized that the measure would authorize the Governor " 'to block the parole of convicted murderers.' " (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) argument in favor of Prop. 89, p. 46.) The ballot arguments reveal, however, that a fuller statement of the proponents' position was that the measure would give the Governor "the authority to block the parole of criminals *who still pose a significant threat to society.*" (*Id.,* rebuttal to argument against Prop. 89, p. 47, italics added.) It is clear from the ballot arguments as a whole that the proponents of the measure were of the view that the parole authority had not always properly applied *the existing standards* regarding a prisoner's suitability for parole, and to remedy the situation they proposed to subject the parole authority's decision to an additional level of review, by the Governor. The measure *did not,* however, *propose to change the then existing standards* governing the suitability determination and, indeed, specifically declared that the Governor could act "only . . . on the basis of the *same factors* which the parole authority is required to consider." (Art. V, § 8(b), italics added.) As explained above, because article V, section 8(b), did not change the substantive standards under which a prisoner's suitability for parole is to be judged, but simply subjected the parole authority's determination to review by the Governor, the provision clearly constitutes the type of procedural provision whose retroactive application does not fall within the reach of the ex post facto clause.

A

We begin with a brief review of the applicable California statutes and regulations governing parole decisions by the Board. The governing statutes provide that the Board is the administrative agency within the executive branch that generally is authorized to grant parole and fix release dates. (Pen. Code, §§ 3040, 5075 et seq.)

Penal Code section 3041 provides that with regard to prisoners sentenced to indeterminate prison terms, one year prior to the inmate's minimum eligible parole release date, the Board "shall normally set a parole date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." (Pen. Code, § 3041, subd. (a).) In addition, the statute provides that the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (*Id.*, § 3041, subd. (b).) Furthermore, the statute directs the Board to "establish criteria for the setting of parole release dates." (Pen. Code, § 3041, subd. (a).)

The Board's criteria for setting parole dates for individuals convicted of murder committed after 1978, as in the present case, are set forth in title 15, division 2, chapter 3, article 11 of the California Code of Regulations. Pursuant to section 2401 of title 15 of these regulations: "A parole date *shall* be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date *shall* be set if the prisoner is found suitable for parole under Section 2402(d)." (Italics added.)

According to the applicable regulation, circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner;[11] (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has

---

[11]Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

The regulation further provides that circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).)

■ In sum, the governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense under-lying the conviction. (Pen. Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. (Cal. Code Regs., tit. 15, § 2401.) Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.

B

Although we have not previously addressed the question of the appropri-ate standard of judicial review of the Board's decisions denying or granting parole, our past decisions do shed considerable light on that issue. To begin with, our prior decisions characterize proceedings before the Board as informal, in contrast to judicial or formal administrative proceedings. (*Pow-ell, supra,* 45 Cal.3d 894, 904; *In re Sturm* (1974) 11 Cal.3d 258, 267 [113

Cal.Rptr. 361, 521 P.2d 97] (*Sturm*).) We have explained that parole release decisions concern an inmate's anticipation or hope of freedom, and entail the Board's attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. (*Sturm, supra*, 11 Cal.3d at p. 266.) "The [Board's] exercise of its broad discretion 'involves the deliberate assessment of a wide variety of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and of the public.' [Citation.]" (*Powell, supra*, 45 Cal.3d at p. 902.) "The [Board's] discretion in parole matters has been described as 'great' [citation] and 'almost unlimited' [citation]." (*Ibid.*)

Nevertheless, our past decisions also make clear that the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the broad discretionary authority of the Board. In *Sturm, supra*, 11 Cal.3d 258, we found in prior California decisions "a limited cognizance of rights of parole applicants to be free from an arbitrary parole decision, to secure information necessary to prepare for interviews with the [Board], and to something more than mere pro forma consideration." (*Id.* at p. 268.) Recognizing that the existence of such rights could not exist in any practical sense without a remedy against their abrogation, our decision held that the remedy available to correct arbitrary action by the Board was the writ of habeas corpus, and that the effectiveness of this remedy necessarily depended upon a statement of reasons for the Board's decision. (*Id.* at pp. 269-270.) Accordingly, we held in *Sturm* that the Board must provide a definitive written statement of its reasons for denying parole. (*Id.* at p. 273.)

In addition, even before factors relevant to parole decisions had been set forth expressly by statute and by regulation, we concluded that "[a]ny official or board vested with discretion is under an obligation to consider *all* relevant factors [citation], and the [Board] cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature." (*In re Minnis* (1972) 7 Cal.3d 639, 645 [102 Cal.Rptr. 749, 498 P.2d 997].) "Although a prisoner is not entitled to have his term fixed at less than maximum or to receive parole, he is entitled to have his application for these benefits 'duly considered' " based upon an individualized consideration of all relevant factors. (*Id.* at p. 646; see also *In re Ramirez* (2001) 94 Cal.App.4th 549, 569-572 [114 Cal.Rptr.2d 381].)

As noted, prior decisions of this court have not determined the proper standard for reviewing the factual basis for the Board's exercise of discretion in finding a prisoner unsuitable for parole. We have, however, decided the standard for reviewing the factual basis of a decision by the Board to *rescind*

parole before the prisoner has been released. As we shall explain, we determine that the same standard governs judicial review of a Board decision to *deny* parole.

After the Board has set a parole date for a prisoner, the Board is authorized to rescind that date for cause. (*Powell, supra,* 45 Cal.3d at p. 901.) Cause for rescission of parole may be established by circumstances such as disciplinary misconduct, a deterioration in the mental state of the inmate, or an inability to meet a special condition of parole. (*Id.* at p. 902.) In *Powell,* after determining that a prison inmate did not possess any vested right in his prospective liberty on a parole release date previously specified, and reiterating the principle that the Board enjoys broad discretion in parole matters, our decision rejected both an independent judgment standard of judicial review and a substantial evidence standard of review of the factual basis for the Board's decision to rescind parole. (*Id.* at pp. 903-904.) We relied in part upon *Superintendent v. Hill* (1985) 472 U.S. 445, 456 [105 S.Ct. 2768, 2774-2775, 86 L.Ed.2d 356], which held, with regard to the decision of a prison disciplinary board revoking good behavior credits, that the due process clause of the federal Constitution was satisfied as long as there was " 'some basis in fact' " and " 'some evidence' " to support the board's findings. (*Powell, supra,* at p. 904.)

Our decision in *Powell* explained: "A parole date, like a good time credit, is a prospective benefit that is conditioned on the inmate's continued good performance and subject to review and withdrawal for cause by the [Board]. While the board cannot rescind a parole date arbitrarily or capriciously, it does not abuse its discretion when it has some basis in fact for its decision. As stated above, the [Board] must strike 'a balance between the interests of the inmate and of the public.' [Citation.] If it is to accomplish this delicate task, it must operate with broad discretion and not be 'subject to second-guessing upon review.' [Citation.] Accordingly, we hold that due process requires only that there be *some evidence* to support a rescission of parole by the [Board]." (*Powell, supra,* 45 Cal.3d at p. 904, fn. omitted, italics added.) Resolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board. (*Id.* at p. 906.)

An incarcerated individual for whom a parole date has not been set possesses less of an expectation of liberty than one for whom a release date previously has been established by the Board. Nevertheless, in determining whether a prisoner is suitable for parole, the Board must consider circumstances and render a decision analogous to a decision determining whether there is cause to rescind parole. In rendering each type of decision, the Board must consider specified factors and exercise broad discretion in balancing

the interests of the inmate and of the public. To impose a standard of review that is less stringent than the "some evidence" test set forth in *Powell* would permit the Board to render a decision without any basis in fact. Such a decision would be arbitrary and capricious, thereby depriving the prisoner of due process of law. Recent Court of Appeal decisions have reached the same conclusion. (E.g., *In re Ramirez, supra*, 94 Cal.App.4th 549, 562-564; *Rosenkrantz II, supra*, 80 Cal.App.4th 409, 423.)

Without discussing *Powell, supra*, 45 Cal.3d 894, the Governor contends that the judicial branch is authorized to review the Board's parole decisions only to ensure that all *procedural safeguards* have been satisfied, but not to consider the *merits* of a parole decision. To the extent the Governor asserts that the court is not authorized to determine whether the Board's parole decision has a factual basis and thus satisfies the requirements of due process of law, we disagree.

The Governor relies upon *Roberts v. Duffy* (1914) 167 Cal. 629 [140 P. 260], which held that a prisoner possessed the right to present an application to the Board as soon as he became eligible for parole, but that a prisoner eligible for parole did not possess an absolute right to be paroled simply because his prison conduct had been good. The plurality opinion of the court stated that, contrary to the prisoner's contention, the Legislature intended that the issue whether an inmate should be released on parole should "be left to the judgment and discretion of the [B]oard to be exercised as it might be satisfied that justice in the case of any particular prisoner required." (*Id.* at p. 640.) A concurring opinion expressed the view that the plurality opinion had declared, in effect, "that the determination of the [B]oard, on any application for parole, *is conclusive on the courts, regardless of the reasons or facts upon which it may be based.*" (*Id.* at pp. 641-642, italics added.)

In support of his contention that the courts are not authorized to review the merits of parole suitability decisions, the Governor relies, in particular, upon the foregoing italicized language from the concurring opinion in *Roberts v. Duffy, supra*, 167 Cal. at pages 641-642. In addition, the Governor claims that a long line of decisions has "uniformly limited judicial review of executive parole decisions to examining whether all procedural requirements have been met." Although, as discussed above, a number of decisions have required that certain procedural safeguards be observed by the Board in parole decisions, our more recent decision in *Powell, supra*, 45 Cal.3d 894, also held that due process of law requires that the factual basis of a decision by the Board to rescind parole be supported by some evidence. Thus, contrary to the Governor's contention, in *Powell* we authorized the courts to conduct a limited review of the merits of the Board's parole decisions.

Because no parole hearing had been conducted in *Roberts v. Duffy, supra,* 167 Cal. 629, our opinion in that case had no occasion to decide whether a decision by the Board denying parole must have a factual basis, and, of course, we could not have considered subsequent principles of constitutional law that now control the resolution of this issue. Therefore, we disagree with the Governor's assertion that the judiciary's review of the Board's parole decisions is limited to determining whether procedural safeguards have been observed. As the United States Supreme Court has recognized in a comparable setting, "[r]equiring a modicum of evidence to support a decision . . . will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens." (*Superintendent v. Hill, supra,* 472 U.S. at p. 455 [105 S.Ct. at p. 2774].)

■ Accordingly, we conclude that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law. (See *In re Ramirez, supra,* 94 Cal.App.4th at p. 572; *In re Bowers* (1974) 40 Cal.App.3d 359, 362 [114 Cal.Rptr. 665].)[12]

IV

■ Having concluded that a decision of the *Board* denying parole is subject to the some evidence standard of review, we next consider whether the *Governor's* decision pursuant to article V, section 8(b), to reverse a decision of the Board granting parole is subject to judicial review and, if so, what standard governs the court's review of that decision by the Governor.

A

Before the addition of article V, section 8(b), to the California Constitution in November 1988 by initiative (Proposition 89), the power to grant or

---

[12]Because we conclude as a matter of California law that the "some evidence" standard of review is applicable to judicial review of a Board's decision denying parole, we have no occasion to determine whether the same standard is also mandated under federal constitutional principles. (See *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 901-904.) We note that petitioner does not contend that the federal Constitution imposes a more stringent standard of review than the "some evidence" standard.

deny parole was statutory and committed exclusively to the judgment and discretion of the Board. (*In re Fain* (1983) 145 Cal.App.3d 540, 548-550 [193 Cal.Rptr. 483].) The Governor had no direct role in decisions whether to grant or deny parole to an incarcerated individual. (*Ibid.*; cf. Pen. Code, §§ 3041.1 [authorizing the Governor to request that the full Board sitting in bank review a parole decision], 3062 [authorizing the Governor to revoke parole].) The constitutional authority of the Governor in this area was limited to the fundamentally distinct power to grant a reprieve, pardon, or commutation. (*In re Fain, supra*, 145 Cal.App.3d at p. 548; see Cal. Const., art. V., § 8, subd. (a).) By adding article V, section 8(b), to the California Constitution, the voters conferred upon the Governor constitutional authority to review the Board's decisions concerning the parole of individuals who have been convicted of murder and are serving indeterminate sentences for that offense.[13]

As noted above (see, *ante*, p. 626, fn. 1), article V, section 8(b), provides in full: "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

The statutory procedures governing the Governor's review of a parole decision pursuant to article V, section 8(b), are set forth in Penal Code section 3041.2, which states:

"(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an

---

[13]In addition to the procedure established by article V, section 8(b), authorizing the Governor directly to review and to reverse or modify a Board decision granting or denying parole in cases falling within that provision's purview, there are a variety of other procedures a Governor may utilize upon obtaining information that raises questions as to the propriety of a Board decision granting parole. Under Penal Code section 3041.1, the Governor has authority, up to 90 days prior to a scheduled parole release date, to request the full Board to grant in bank review of a panel's parole decision, and must state the reason or reasons for the request, indicating "whether the request is based on a public safety concern, a concern that the gravity of current or past convicted offenses may have been given inadequate consideration, or on other factors." Further, the Board itself retains the authority to rescind the grant of parole for good cause prior to the prisoner's release (Pen. Code, §§ 3041.5, 3041.7), and the Governor may bring to the Board's attention any information that may warrant the rescission of parole. Finally, after a prisoner has been released on parole, both the Board and the Governor have the power to suspend or revoke parole for cause. (Pen. Code, §§ 3060, 3062, 3063.) None of these additional procedures are implicated in this case.

indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority.

"(b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

Neither the Constitution nor any statute contains provisions expressly providing for judicial review of the Governor's decisions rendered pursuant to the authority conferred by article V, section 8(b).

## B

Petitioner contends that, just as the Board's parole decision must satisfy the requirements of procedural due process under California law, the Governor's independent decision pursuant to article V, section 8(b), whether to affirm, modify, or reverse a parole decision of the Board also must satisfy these requirements. We agree.

Article V, section 8(b), provides that "the Governor *may* review the [parole] decision *subject to procedures provided by statute.*" (Italics added.) This language confers upon a Governor the discretion whether to review a parole decision, but if such discretion is exercised, he or she is constrained by the procedures specified by statute. Article V, section 8(b), further states: "The Governor may only affirm, modify, or reverse the decision of the parole authority *on the basis of the same factors which the parole authority is required to consider.*" (Italics added.) Thus, the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision. (See *In re Ramirez, supra,* 94 Cal.App.4th 549, 559-560; *Arafiles, supra,* 6 Cal.App.4th at pp. 1478-1479.)

The foregoing constitutional and statutory provisions thus set forth standards and criteria that limit the Governor's review of a parole decision pursuant to article V, section 8(b), and give rise to a protected liberty interest under the California due process clause. As relevant here, a prisoner granted parole by the Board has an expectation that the Governor's decision to affirm, modify, or reverse the Board's determination will be based upon the same factors the Board is required to consider. Although these provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is

limited to the same considerations that inform the Board's decision. The materials in the Ballot Pamphlet for the November 8, 1988, General Election regarding Proposition 89, which added section 8, subdivision (b), to article V of the California Constitution, confirm this limitation. The analysis prepared by the Legislative Analyst stated that in making parole decisions, the Board must consider many factors, including the seriousness of the inmate's offense, the safety of the public, and statements from the public. With regard to the effect of Proposition 89, this analysis stated: "In reviewing parole decisions, the Governor could consider only that information which the [Board is] required to consider in making [its] parole decisions." (Ballot Pamp., Gen. Elec., *supra*, analysis of Prop. 89 by Legis. Analyst, p. 44.) Similarly, the argument against Proposition 89 stated that the initiative would grant to the Governor "the same powers and the duty to apply the same rules" as the parole board. (*Id.*, argument against Prop. 89, p. 47.)

Because prisoners possess a protected liberty interest in connection with parole decisions rendered by the Board, it would be anomalous to conclude that they possess no comparable interest when such decisions are reviewed by the Governor, where such review must be based upon the same factors considered by the Board. Under California law, this liberty interest underlying a Governor's parole review decisions is protected by due process of law.

## C

According to petitioner, the same considerations that authorize judicial review of the Board's parole decisions, in order to ensure that they comply with due process requirements, subject a Governor's decisions affirming, modifying, or reversing the Board's decisions to judicial review to ensure compliance with due process of law. The Governor, on the other hand, asserts that judicial review of the merits of his parole decisions in this context would violate the separation of powers doctrine. The Governor does concede that a court properly could review a gubernatorial parole decision to determine whether the decision, *on its face*, is made with due consideration, complies with procedural requirements, is not based upon invidious grounds, and is not made for an arbitrary reason. The Governor claims, however, that the separation of powers doctrine precludes the court from looking beyond the *face* of his decision to determine whether it is in fact supported by evidence in the record.

Article III, section 3 of the California Constitution states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

■ In recent decisions we have explained the purpose and effect of this constitutional provision. "The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch. [Citations.]" (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 297 [105 Cal.Rptr.2d 636, 20 P.3d 533].) "Although article III, section 3 of the California Constitution 'defines a system of government in which the powers of the three branches are to be kept largely separate, it also comprehends the existence of common boundaries between the legislative, judicial, and executive zones of power thus created. [Citation.] Its mandate is "to protect any one branch against the overreaching of any other branch." ' " (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 595-596 [79 Cal.Rptr.2d 836, 967 P.2d 49].) "[T]he separation of powers principle does not command 'a hermetic sealing off of the three branches of Government from one another.' [Citation.]" (*Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 338 [178 Cal.Rptr. 801, 636 P.2d 1139].) "The doctrine . . . recognizes that the three branches of government are interdependent, and it permits actions of one branch that may 'significantly affect those of another branch.' [Citation.]" (*Carmel Valley Fire Protection Dist. v. State of California, supra*, 25 Cal.4th at p. 298.)

■ Thus, our prior decisions have held that in certain situations one branch of government properly can exercise a function that only incidentally affects a power vested primarily in another branch of government. For example, "[w]ith respect to encroachment on the power of the executive, we observed, in rejecting a claim that a statute providing for the expungement of certain criminal records duplicated the Governor's clemency power in some cases and therefore infringed upon the executive power, in violation of the doctrine of separation of powers: 'The purpose of the doctrine is to prevent one branch of government from exercising the *complete* power constitutionally vested in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch.' [Citation.]" (*Carmel Valley Fire Protection Dist. v. State of California, supra*, 25 Cal.4th at p. 298, discussing and quoting *Younger v. Superior Court* (1978) 21 Cal.3d 102, 117 [145 Cal.Rptr. 674, 577 P.2d 1014].)

In addition, with regard to functions over which one branch of government possesses primary and inherent power, the other branches do not necessarily violate the separation of powers doctrine simply because they undertake actions that affect those core functions. (*Obrien v. Jones* (2000) 23 Cal.4th 40, 48 [96 Cal.Rptr.2d 205, 999 P.2d 95].) We have held that the separation of powers doctrine is violated only when the actions of a branch of government defeat or materially impair the inherent functions of another branch. (*Id.* at pp. 49-57.)

With these principles in mind, we consider whether the Governor's decision to affirm, modify, or reverse a parole decision of the Board can be subject to judicial review without violating the separation of powers doctrine. As established above, the due process clause requires, among other things, that the factual basis of a decision by the Board denying parole must be premised upon some evidence relevant to the factors the Board is required to consider. The Governor, however, maintains that the imposition of that same requirement upon his decision would permit a court to arrogate to itself one of the core constitutional functions of the executive branch—the execution of a lawfully imposed sentence.

The Governor relies in part upon *Jenkins v. Knight* (1956) 46 Cal.2d 220 [293 P.2d 6], which held that the judicial branch is authorized to compel the Governor to comply with ministerial duties imposed by the Constitution, but that courts will not interfere with the Governor's performance of political or executive acts that involve "the exercise of judgment and discretion." (*Jenkins*, at p. 224.) The decision in *Jenkins* included among these types of discretionary acts the granting of pardons. (*Id.* at p. 223.) The Governor's pardon authority, however, is not subject to the same type of substantive limitations as is his parole review authority. "[T]he Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation," subject to specified exceptions. (Cal. Const., art. V, § 8, subd. (a).) Considering a similarly worded state constitutional provision regarding the pardon authority of a governor, the United States Supreme Court stated: " '[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.' [Citation.] The Due Process Clause is not violated where . . . the procedures in question do no more than confirm that the clemency and pardon powers are committed, as is our tradition, to the authority of the executive." (*Ohio Adult Parole Authority v. Woodard* (1998) 523 U.S. 272, 276 [118 S.Ct. 1244, 1247, 140 L.Ed.2d 387], fn. omitted; see *People v. Ansell* (2001) 25 Cal.4th 868, 891 [108 Cal.Rptr.2d 145, 24 P.3d 1174] [pardon decision is discretionary and rests ultimately with the Governor].)[14]

Although article V, section 8(b), confers upon the Governor discretion regarding the manner in which to weigh the constitutionally specified factors, and authorizes the Governor to exercise judgment in reaching a decision, the voters in adopting the constitutional provision placed substantive limitations upon the Governor's exercise of that judgment and discretion.

[14]The California Constitution qualifies the gubernatorial pardon authority by providing that "[t]he Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring." (Cal. Const., art. V, § 8, subd. (a).)

The provision mandates that the Governor consider only the same factors that may be considered by the Board. Having chosen to review a parole decision, the Governor lacks discretion to disregard this requirement, which distinguishes the Governor's parole review authority from his authority to grant pardons and commutations. Because this requirement gives rise to a liberty interest protected by due process of law, and because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate. As with decisions of the Board, the existence of this due process right cannot exist in any practical sense without a remedy against its abrogation. (*Sturm, supra,* 11 Cal.3d 258, 269-270.)

The Governor also contends that, because the executive branch is vested with the sole constitutional authority to execute a sentence once it has been imposed by the courts, the judiciary is precluded from interfering with the executive's parole decisions. He relies by analogy upon our recent decision in *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 553 [117 Cal.Rptr.2d 168, 41 P.3d 3], which stated that the separation of powers doctrine prohibits prosecutors from controlling a court's sentencing choices *after* the jurisdiction of the court has been invoked, but that a prosecutor's discretionary charging decisions made *before* the filing of charges are not invalid simply because they affect the dispositional options available to the court. According to the Governor, the judicial branch similarly is precluded from interfering with the executive branch's parole decisions after a judgment of conviction becomes final. The Governor overlooks, however, our subsequent discussion in *Manduley* regarding the requirements of due process of law. Although we rejected a claim that minors possess a protected liberty interest in remaining in the juvenile court system, we also noted that minors receive a judicial hearing to determine whether the statutory prerequisites for filing charges in criminal court have been satisfied. (*Id.* at p. 564.) Thus, our decision in *Manduley* confirmed the principle that, to the extent a statutory or constitutional provision specifies that the state will not take adverse action against an individual unless certain conditions exist, the courts are authorized to ensure that the individual is not deprived of any liberty interest arising from such a provision without due process of law.

Contrary to the Governor's contention, judicial review to ensure that gubernatorial parole decisions are supported by some evidence neither overrides the merits of the decisions nor controls the exercise of executive discretion. As the United States Supreme Court explained in a related context: "Requiring a modicum of evidence to support a decision [to deny parole] will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens. In a variety of

contexts, the [United States Supreme] Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence. [Citations.]" (*Superintendent v. Hill, supra*, 472 U.S. 445, 455 [105 S.Ct. 2768, 2774].) "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by [the Governor]. [Citations.]" (*Id.* at pp. 455-456 [105 S.Ct. at p. 2774], italics added.)

Thus, the "some evidence" standard is extremely deferential and reasonably cannot be compared to the standard of review involved in undertaking an independent assessment of the merits or in considering whether substantial evidence supports the findings underlying a gubernatorial decision. If we were to adopt the Governor's position, a parole review decision with no basis in fact and not supported by *any* evidence in the record would be upheld as long as the decision, on its face, recited supposed facts corresponding to the specified factors and appeared reasonable. Such a decision, however, would be arbitrary and capricious and, because it affected a protected liberty interest, would violate established principles of due process of law. Although the Governor concedes that a gubernatorial parole decision is subject to judicial review to determine whether it is arbitrary or capricious, we reject his implicit contention that a decision without *any* factual basis in the record would not constitute an arbitrary and capricious decision.

Long before the adoption of article V, section 8(b), parole decisions made by the executive branch (i.e., by the Board) were subject to judicial review without any indication that such review violated the separation of powers doctrine. (See, e.g., *In re Streeter* (1967) 66 Cal.2d 47, 49 [56 Cal.Rptr. 824, 423 P.2d 976]; *In re McLain* (1960) 55 Cal.2d 78, 87 [9 Cal.Rptr. 824, 357 P.2d 1080].) When Proposition 89 was presented to the voters, no suggestion was made that the Governor's review of parole decisions—which the proposed constitutional provision limited specifically to the same factors that are required to be considered by the Board—uniquely would be exempted from the limited form of judicial review that previously had existed with regard to the Board's parole decisions. On the contrary, review by the Governor was described simply as another level of scrutiny or examination of parole decisions. (Ballot Pamp., Gen. Elec., *supra*, argument in favor of Prop. 89, p. 46.) In light of the type of restrictions placed upon the Governor's review by the wording of the provision, it is reasonable to infer that the drafters contemplated that these restrictions would be enforced and made effective through the process of judicial review—the only effective

check upon the Governor's exercise of the authority conferred by article V, section 8(b).

Contrary to the Governor's position, his decisions pursuant to article V, section 8(b), are not insulated from judicial review solely because the Governor, rather than an administrative agency within the executive branch, renders those decisions. (Cf. *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 170 [2 L.Ed. 60, 71] ["It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined."].) This court's prior decisions demonstrate that even discretionary actions undertaken individually by a Governor can be subjected to judicial review without violating the separation of powers doctrine. For example, a court properly can review a Governor's exercise of the line-item veto to determine whether the veto conforms to constitutional limitations. (See *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1084-1089 [240 Cal.Rptr. 569, 742 P.2d 1290].) In addition, this court has made the determination whether the Governor (or the Lieutenant Governor, in the Governor's absence) acted within the scope of his constitutional authority in making and withdrawing a judicial appointment. (*In re Governorship* (1979) 26 Cal.3d 110 [160 Cal.Rptr. 760, 603 P.2d 1357].) Thus, where the Constitution vests authority in the Governor to undertake certain actions, the judiciary properly can review a Governor's action to ensure that it complies with any constitutional limitations. Such review does not violate the separation of powers doctrine, but rather ensures that a Governor does not exceed the constitutional powers vested in the executive. In the present context, for example, judicial review could prevent a Governor from usurping the legislative power, in the event a Governor failed to observe the constitutionally specified limitations upon the parole review authority imposed by the voters and the Legislature.

This type of judicial review is not limited to actions undertaken by the executive branch or the Governor. Certain decisions rendered by the judicial branch, for example, also are subject to judicial review to determine whether they are supported by some evidence. Regulating the practice of law is a core function of the judicial branch of each state. (*In re Attorney Discipline System, supra,* 19 Cal.4th at pp. 592-593.) In *Schware v. Board of Bar Examiners* (1957) 353 U.S. 232 [77 S.Ct. 752, 1 L.Ed.2d 796, 64 A.L.R.2d 288], the New Mexico Supreme Court had upheld a decision of the state's board of bar examiners to deny an applicant admission to the bar on the ground he lacked good moral character. After establishing that the applicant could not be excluded from the practice of law for reasons that contravened the due process clause, the United States Supreme Court stated that any standard or qualification for admission must have a rational connection to

the applicant's fitness or capacity to practice law, and that "[e]ven in applying permissible standards, officers of a State cannot exclude an applicant when there is *no basis for their finding* that he fails to meet these standards . . . ." (*Id.* at p. 239 [77 S.Ct. at p. 756], italics added.) The high court found "nothing in the record" suggesting that the applicant had engaged in any conduct reflecting adversely upon his character, and thus concluded that the state had deprived him of due process of law. (*Ibid.*) Therefore, even though the state's decision was made by the judicial branch in the exercise of its primary and inherent authority over the regulation of the practice of law, the federal high court reviewed the decision because it affected the property and liberty interests of bar applicants and thus was required to be supported by some evidence in the record. Such review does not arrogate to the federal courts each state's core judicial function of regulating the practice of law and does not control the state judiciary's exercise of discretion with regard to such matters. Rather, this review simply ensures that actions by the state judiciary that affect constitutionally protected interests comply with minimum requirements of due process of law. And, of course, judicial review of laws enacted by the legislative branch, to ensure that they meet constitutional requirements, often includes a consideration of the factual basis for the legislative action. (E.g., *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 482-491 [97 Cal.Rptr.2d 334, 2 P.3d 581] [considering circumstances giving rise to legislative restrictions upon assault weapons].) Thus, the core activities of all three branches of government may be subject to judicial review to determine whether they have a factual basis.

Similarly, judicial review of a Governor's parole decisions made pursuant to article V, section 8(b), to determine whether they are supported by some evidence related to the specified factors governing parole, does not usurp the inherent and primary authority of the executive branch over parole matters, does not materially impair such authority, and does not control a Governor's exercise of discretion. Any effect of judicial review upon the executive's parole decisions is merely incidental to the exercise of that function and therefore does not violate the separation of powers doctrine. Accordingly, we conclude that the courts properly can review a Governor's decisions whether to affirm, modify, or reverse parole decisions by the Board to determine whether they comply with due process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the Board.

V

As stated above, the Court of Appeal held that the law of the case doctrine established that there was no evidence supporting the Governor's

decision to reverse the Board's decision granting parole. The Governor contends that the Court of Appeal erroneously applied this doctrine under the circumstances of the present case. We agree.

■ "The rule of 'law of the case' generally precludes multiple appellate review of the same issue in a single case. The doctrine applies to this court even though the previous appeal was before a Court of Appeal. . . . 'Where a decision upon appeal has been rendered by a District Court of Appeal and the case is returned upon a reversal, and a second appeal comes to this court directly or intermediately, for reasons of policy and convenience, this court generally will not inquire into the merits of said first decision, but will regard it as the law of the case.' [Citations.]" (*Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434 [212 Cal.Rptr. 466, 696 P.2d 1308].) The principle applies to criminal as well as to civil matters. (*People v. Stanley* (1995) 10 Cal.4th 764, 786 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

The doctrine of law of the case, however, governs later proceedings in the *same case* (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701 [107 Cal.Rptr.2d 149, 23 P.3d 43]) with regard to the rights of the *same parties* who were before the court in the prior appeal. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301 [253 Cal.Rptr. 97, 763 P.2d 948]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.)[15] ■ As we shall explain, the prior appeal that the Court of Appeal deemed to have established the law of the case in the present proceeding did not involve the same case or the same parties who were before the court in the present proceeding. Therefore, the appellate court erred in applying this doctrine to establish that there was no evidence supporting the Governor's parole decision.

In *Rosenkrantz II, supra*, 80 Cal.App.4th 409, the Court of Appeal decided the Board's appeal from the superior court's order granting a petition for writ of habeas corpus and compelling the Board to find petitioner suitable for parole. That habeas corpus petition sought review of the Board's parole suitability decisions. The Board filed a return to the petition. The superior court's order reviewed by the Court of Appeal was limited to granting petitioner relief in connection with parole hearings held before the Board. The Governor did not appear in that habeas corpus proceeding in the superior court or in the Board's appeal in the Court of Appeal. As mentioned

---

[15]The doctrines of res judicata and collateral estoppel can give conclusive effect to a former judgment or to the determination of an issue in a different proceeding. (*Griset v. Fair Political Practices Com., supra*, 25 Cal.4th at pp. 701-702.) Petitioner relied upon collateral estoppel in his petition for writ of habeas corpus, but the trial court's order did not mention that doctrine, and no party in the case now before us has invoked the doctrine in the Court of Appeal or in this court.

previously, in *Rosenkrantz II* the Court of Appeal determined that there was no evidence supporting the factual findings underlying the Board's determination that petitioner was unsuitable for parole. (*Id.* at pp. 424-427.)

After the decision in *Rosenkrantz II*, the Board held a new hearing and, under the compulsion of *Rosenkrantz II*, found petitioner suitable for parole. Acting pursuant to article V, section 8(b), the Governor reversed that decision by the Board. Petitioner then filed an amended petition for writ of habeas corpus in which, for the first time, he challenged the Governor's parole review decision. The petition identified the parties to the proceeding as petitioner, the Governor, and the warden of the prison where petitioner is confined. The Board was not identified as a party and did not appear in the proceeding. The superior court's order was limited to reviewing the Governor's parole decision; that court's decision to grant the petition and to order petitioner's release was based upon its determination that the Governor's decision was not supported by any evidence and that the Governor had a policy of denying parole in virtually all murder cases.

In the present case, the Court of Appeal determined that, because the Governor reviewed the same evidence considered by the Board in connection with the parole decisions reviewed in *Rosenkrantz II*, "it necessarily follows that there is no evidence to support the Governor's decision reversing the Board's suitability finding." The appellate court relied upon the following principle: "Where the reviewing court has determined on the first appeal, as a matter of law, that there was 'no sufficient evidence,' and there was 'no substantial difference in the evidence at the retrial, the former decision is the law of the case.' [Citations.]" (Italics omitted.) The Court of Appeal majority did not consider, however, whether the underlying amended petition for writ of habeas corpus constituted *the same case reviewed in Rosenkrantz II* (and thus whether the latest habeas corpus proceeding was analogous to a retrial after appeal), or whether the Board and the Governor constituted the same party.

Here, the first petition for writ of habeas corpus challenged the Board's parole decision. The second petition challenged the Governor's parole decision. Even though the goal of both habeas corpus proceedings was to obtain petitioner's release on parole, each petition challenged, on different grounds, separate parole decisions made by independent parole authorities. Accordingly, we determine that the two proceedings constitute separate cases.

Furthermore, in order for the decision in *Rosenkrantz II* to have become the law of the case, "it must have been a decision on appeal upon the identical issues tried before the court below." (*Remondino v. Remondino*

(1940) 41 Cal.App.2d 208, 218 [106 P.2d 437].) Although the Governor considered the same record and factors as did the Board in reaching the decisions reviewed in *Rosenkrantz II*, the Governor's decision and findings were not identical to those of the Board. The Governor relied upon some factors and evidence that were not discussed in the Board's decisions, and the determination whether some evidence supported the particular findings forming the basis for the Governor's decision is not the same as the determination whether some evidence supported the factual basis for the Board's decisions. Indeed, the trial court decisions in each case were based upon different grounds.

Moreover, the Governor and the Board are not the same party in the context presented. The Court of Appeal's broad conclusion in *Rosenkrantz II* that there was no evidence supporting the Board's finding of parole unsuitability could not bind the Governor, who is constitutionally authorized to render an independent decision regarding that ultimate question. (Cf. *People v. Rath Packing Co.* (1974) 44 Cal.App.3d 56, 66-67 [118 Cal.Rptr. 438] [the People and specified government officials can constitute the same parties when named in different actions concerning the same facts and relief].) The "some evidence" standard of judicial review requires the court in the present case to determine whether the factual basis for the *Governor's* decision is supported by some evidence. The Court of Appeal did not undertake such a review, but erroneously relied upon its previous conclusion that the *Board's* finding of parole unsuitability was not supported by any evidence.

Under these circumstances, we conclude that the Court of Appeal erred in holding that the law of the case doctrine was applicable in this case.

## VI

We have determined that the judicial branch properly can review a gubernatorial decision reversing a grant of parole, in order to ascertain whether the decision is supported by some evidence related to the pertinent criteria specified by law. We further have concluded that the law of the case doctrine does not establish that the Governor's decision in the present case is not supported by any evidence. Therefore, we proceed to consider whether some evidence supports the factual basis for the Governor's decision.

## A

The decision of the Governor (set forth in a 12-page document) reversing the Board's parole of petitioner first described in some detail the circumstances related to the crime. The Governor's decision recited many of the

facts set forth in part I of this opinion, *ante*, as well as the following additional circumstances. During the altercation at the beach house on June 21, 1985, after petitioner obtained control of the stun gun from his brother Joey, petitioner used it multiple times on Joey, burning his face. Redman struck petitioner with a flashlight, breaking petitioner's nose. Petitioner asked one of his friends to retrieve a BB gun from petitioner's vehicle, and petitioner stated to Joey and Redman that they would not leave the house alive unless they agreed to maintain his secret regarding his sexual orientation. At the time of this incident, petitioner was approximately five feet 11 inches tall and weighed 160 pounds; Redman was approximately five feet five inches tall and weighed 120 pounds. Subsequently, petitioner informed authorities that he was willing to kill Joey and Redman to prevent his parents from learning about his sexual orientation.

Three days later on June 24, petitioner purchased the Uzi, met with a former coworker, displayed the receipt for the Uzi, and stated that he would like to kill Joey and Redman. After telephoning Redman on June 26 and June 27 and hearing that Redman refused to recant his statements regarding petitioner's sexual orientation, petitioner went to Redman's home and waited for him, spending the night in his own vehicle. Petitioner subsequently stated to authorities that he intended to force Redman to return home with him to retract his story regarding the events at the beach house. "However, in a 1998 parole hearing [petitioner] contradicted himself by admitting that he went to Mr. Redman's home 'with the thought in [his] mind' that he might kill [Redman]."

Petitioner shot Redman at very close range—from a distance of five to seven feet, according to one witness—and in multiple bursts. Petitioner testified that, as Redman was lying on the ground, he shot him three or four times in the head with the intention of killing him. The murder took place on June 28, one week after the altercation at the beach house. Petitioner fled the scene, leaving Redman to die on the roadway.

Petitioner then drove to San Francisco with the loaded Uzi, which he kept with him during the next 24 days that he remained a fugitive. With regard to petitioner's telephone call to a deputy sheriff approximately 12 hours after the murder, the Governor's decision stated: "[Petitioner] said of the crime, 'I had to do it because he asked for it,' and 'nobody can fuck with me like that and get away with it.' He stated that Mr. Redman had paid the price and was 'a worthless kid, so don't feel too bad about him.' [Petitioner] ignored [the deputy's] pleas to turn himself in, telling the deputy that he wanted to just have fun 'for a little while, then go and get chained up.'" On July 13, 1985, petitioner contacted a nurse at a psychiatric hospital and "told her that he did

society a favor by shooting Mr. Redman, and that [petitioner's] parents and family, along with the victim, were the cause of [petitioner's] problems."

Petitioner later stayed with a family in Stockton. He showed the Uzi to friends and posed for photographs while holding the Uzi against a backdrop of a military jacket with the emblem of a skull. During this period, petitioner briefly returned to Calabasas and retrieved a television and a stereo from the home of his parents. In addition, petitioner purchased a 32-round magazine for his Uzi for the purpose of "shooting up" Joey's automobile.

After returning to Stockton, traveling to Oregon, and once again returning to Stockton, petitioner learned from friends that law enforcement officials had been looking for him there. Petitioner returned to Calabasas, where he noticed many police officers in the area. Petitioner testified that this circumstance was a factor in his decision to surrender to authorities. Petitioner surrendered at a psychiatric facility, accompanied by his attorney. The investigating deputy sheriff recovered from petitioner's automobile the Uzi, two or three boxes of ammunition, two loaded magazines, and a gun-cleaning kit. Petitioner had 233 rounds of ammunition in his possession at the time he was taken into custody.

The Governor's decision concluded that petitioner was not suitable for parole, because he would pose a significant risk of danger to society if released from prison. His decision stated: "[Petitioner] brutally murdered his victim, firing 10 bullets into the victim's head and body. This was not a spontaneous crime. The murder was preceded by a full week of careful preparation, rehearsal and execution. The stress [petitioner] felt over disclosure of his homosexuality does not minimize the viciousness of the murder. [¶] In addition to the gravity of the offense itself, I also considered [petitioner's] demonstrated lack of remorse as evidenced by his continued efforts to mitigate his role in the crime by painting himself as a victim, and by lying about numerous aspects of the murder. In assessing the risk of danger that [petitioner] poses, in my opinion these factors outweigh the arguments advanced for release, such as his motivation for killing Mr. Redman, his prison record or his parole prospects."

The decision of the Governor then discussed each of the foregoing factors in greater detail. With regard to the seriousness of the crime, the decision quoted from the Court of Appeal's opinion in *Rosenkrantz I, supra,* 198 Cal.App.3d 1187, 1204, which stated that there was ample evidence that petitioner had entertained the intent to kill Redman during the week preceding his commission of the crime: " '[Petitioner's] act of arming himself with a semi-automatic weapon after practicing its use on a shooting range, his

statements to others, his successful attempt to locate the victim's residence, and the confrontation of the victim outside the residence after waiting there for many hours would have supported a conviction of premeditated first degree murder.' " (*Ibid.*) The Governor's decision further relied upon the opposition of the Los Angeles County Sheriff's Department and the Los Angeles County District Attorney to parole because of the gravity of the crime. One of the investigating deputies stated: "This cold-blooded murder required planning, lying in wait, and a degree of sophistication unusual in youthful offenders." Similarly, the report prepared for petitioner's probation and sentencing hearing stated that the aggravating factors included the planning, sophistication, or professionalism with which the crime was carried out. In the Governor's view, the seriousness of the crime, as reflected by the foregoing evidence, demonstrated that petitioner would pose a significant risk of danger to society.

Furthermore, the Governor determined that the stress experienced by petitioner as a result of "the problems he believed he faced due to his homosexuality" did not constitute "stress significant enough to offset the serious nature of this crime." His decision stated that petitioner had indicated that his family relationship was outstanding and very supportive, and that, in addition, petitioner had access to numerous influential persons who could have approached his parents to discuss the issues related to his sexual orientation. Instead of availing himself of these alternatives, petitioner "chose to 'solve' the problem simply by killing Mr. Redman." Again quoting from the Court of Appeal's decision in *Rosenkrantz I, supra,* 198 Cal.App.3d at page 1206, the Governor stated: " 'The jury was unable to accept the premise that [petitioner] reacted to circumstances arousing a passion which "would cause the ordinary reasonable person of average disposition to act rashly and without deliberation and reflection and from such passion rather than from judgment." [Citation.] We believe the jury verdict was a correct assessment of the crime, despite [petitioner's] age.' " According to the Governor, petitioner's "decision to use such violence as the solution to his perceived problem demonstrates that, in my opinion, he poses a significant risk of danger to society."

The decision of the Governor determined that petitioner's conduct after his commission of the crime further demonstrated the danger of violence that would arise from petitioner's release. Petitioner's possession of the Uzi and a large quantity of ammunition during the period he was a fugitive, his postoffense purchase of a 32-round magazine for the Uzi, his posing for photographs with the murder weapon, and his statements to the sheriff's deputy and the nurse indicated that petitioner continued to affirm his violent act after it had occurred. In addition, in opposing petitioner's parole, Redman's father stated that he and his family experienced fear that petitioner

would seek revenge while he remained at large, and that this fear was rekindled by the possibility of petitioner's impending release.

With regard to the issue whether petitioner had exhibited remorse for his crime, the Governor's decision determined that petitioner's conduct and statements demonstrated that he never has assumed full responsibility for the crime. In support of this determination, the decision first cited petitioner's statements to the deputy sheriff and the nurse, described above, in the weeks following the murder. In addition, the decision indicated that at a parole hearing in June 2000, petitioner stated that Redman "did a bad thing," referring to Redman's conduct prior to the murder. Furthermore, the Governor's decision stated that petitioner "has lied about numerous aspects of the offense in an attempt to mitigate his culpability." After citing petitioner's reference to the altercation at the beach house as an attack upon himself, the decision stated: "However, it was [petitioner] who used a stun gun on his brother multiple times while holding him on the ground, had Mr. Redman detained, forced his brother to retrieve tapes from his car, and stated that he was willing to kill both his brother and Mr. Redman to protect his secret." The Governor's decision also noted that petitioner gave conflicting statements at past parole hearings regarding his inculpatory phone call to the nurse. (The decision does not describe these statements.) Finally, the decision observes that petitioner consistently has stated at parole hearings that his father ordered him to leave home after the incident at the beach house, but that at trial petitioner testified that he left voluntarily. The Governor relied upon the principle that "[w]here a defendant acknowledges guilt, but shows no remorse, he may be expected to repeat the criminal conduct under similar circumstances." (Citing *People v. Key* (1984) 153 Cal.App.3d 888, 900 [203 Cal.Rptr. 144].) The decision also relied upon a statement by Redman's father that he was concerned for the security of his family, because petitioner "is capable of exercising horrible retribution on those he perceives have thwarted his life plans and expectations." Thus, the Governor concluded, petitioner would pose an unreasonable risk of danger to society.

The last factor considered by the Governor was petitioner's behavior in prison. The decision stated: "Although [petitioner] has been discipline free and continued his education while in prison, the State of California expects this of all prisoners." Therefore, the Governor concluded that petitioner's good behavior in prison did not outweigh the circumstances of the crime with regard to his suitability for parole.

In conclusion, the Governor's decision stated: "After reviewing the entire record and the factors considered by the Board of Prison Terms, I do not believe that [petitioner] is suitable for parole at this time. . . . In this case,

it is my considered judgment that the gravity of [petitioner's] offense and his repeated attempts to minimize his culpability evidence a continued threat to the public requiring that he remain incarcerated." Again emphasizing the circumstances of the offense and quoting the discussion in *Rosenkrantz I*, *supra*, 198 Cal.App.3d 1187, indicating that the evidence would have supported a conviction of premeditated first degree murder, the Governor's decision stated that petitioner "should be grateful that he was not convicted of first degree murder." The Governor stated his belief that petitioner had not served sufficient time in prison for this very serious crime.

## B

Before considering whether the trial court correctly determined that the decision of the Governor is not supported by any evidence, we summarize the procedures in the underlying habeas corpus proceeding, describe the evidence and the materials that were presented to the trial court, and reiterate the applicable standard of review.

 The petitioner in a habeas corpus proceeding bears the ultimate burden of proving the factual allegations that serve as the basis for his or her request for habeas corpus relief. (*In re Serrano* (1995) 10 Cal.4th 447, 456 [41 Cal.Rptr.2d 695, 895 P.2d 936].) Once the issues of fact have been joined by the respondent's filing of the return to the petition and the petitioner's filing of the traverse, the court may deny relief if it concludes that the petitioner has not alleged facts sufficient to warrant relief. (*People v. Romero* (1994) 8 Cal.4th 728, 739 [35 Cal.Rptr.2d 270, 883 P.2d 388].) If relief depends upon the resolution of disputed issues of fact, the court may order an evidentiary hearing and make findings of fact with regard to such issues. (*Id.* at pp. 739-740.) The various exhibits that may accompany the petition, return, and traverse do not constitute evidence, but rather supplement the allegations to the extent they are incorporated by reference. (See *In re Fields* (1990) 51 Cal.3d 1063, 1070, fn. 2 [275 Cal.Rptr. 384, 800 P.2d 862].) At the evidentiary hearing, such exhibits are subject to admission into evidence in accordance with generally applicable rules of evidence. (See *id.* at p. 1070.)

In the present case, the court conducted an evidentiary hearing at which only documentary evidence was admitted. Although petitioner included as exhibits to his pleadings certain documents that were part of the parole record, such as the transcript of the parole hearing and related documents, he

did not seek to introduce those exhibits into evidence.[16] The only evidence submitted by petitioner consisted of excerpts from a deposition transcript and other documents offered in support of petitioner's allegation that the Governor follows a blanket policy against granting parole to persons convicted of murder.

When counsel for the Governor indicated that he was contemplating introducing the entire parole record into evidence, petitioner objected on the grounds that such evidence would be irrelevant and also would be more prejudicial than probative pursuant to Evidence Code section 352. According to petitioner, the doctrine of collateral estoppel required the trial court to adopt a prior determination by Judge Stoltz, made in connection with the previous proceeding against the Board, that the parole record did not contain any evidence indicating that petitioner was not suitable for parole. The Governor ultimately chose not to introduce the entire parole record on the asserted ground that there was "no real dispute as to the accuracy of the facts stated in the Governor's decision" and because excerpts from the record were included with the return filed by the Governor. The return was entered into evidence without objection.

The trial court stated that its decision was based upon a consideration of the evidence adduced at the hearing, together with the pleadings and "all exhibits appended thereto." The court did not rely upon the doctrine of collateral estoppel. We presume that the trial court accepted as true petitioner's undisputed factual allegations, including any undisputed matters contained in the exhibits incorporated by reference into his pleadings. (See *In re Serrano*, *supra*, 10 Cal.4th at p. 457; *In re Fields*, *supra*, 51 Cal.3d at p. 1070, fn. 2.) These exhibits properly are part of the record in this appeal (Cal. Rules of Court, rule 50(a)(3)), and, indeed, have been cited by the Governor in the Court of Appeal and in this court in support of his factual contentions.

Our examination of the appellate record, which includes the pleadings and exhibits filed by the parties, together with the evidence presented at the hearing, is governed by the standard of review set forth above. ■ Article V, section 8(b), requires that a parole decision by the Governor pursuant to that provision be based upon the same factors the Board is required to consider. Due process of law requires that this decision be

---

[16]The parole record includes a verbatim transcript of the hearing before the Board, the evidence considered by the Board, the evidence upon which the Board relied, and the findings of the hearing panel with supporting reasons. (Cal. Code Regs., tit. 15, § 2254.) The prisoner is entitled to a copy of the record upon request. (*Ibid.*; see also *id.*, § 2255 [the prisoner and his or her attorney shall receive a copy of the decision, specifying the information considered and the reasons for the decision].)

supported by some evidence in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision.

We shall review the trial court's decision and the contentions of the parties in light of the materials that properly were before that court. Because the trial court's findings were based solely upon documentary evidence, we independently review the record. (*In re Serrano, supra,* 10 Cal.4th at p. 457.)

C

 As we explain, we conclude that the Governor's decision finding petitioner unsuitable for parole is supported by some evidence. Although we find that one portion of the decision—regarding petitioner's asserted lying about aspects of the crime in order to minimize his culpability—is not supported by some evidence, the Governor's decision made clear that he would have reached the same conclusion regarding parole suitability even without the determination that petitioner had lied about such matters. Because those portions of the decision that are supported by some evidence constitute a sufficient basis supporting the Governor's discretionary decision to deny parole, we conclude that the decision satisfies the requirements of due process of law.

The Governor initially contends that petitioner is barred from claiming that the Governor's decision is not supported by some evidence, because petitioner did not provide the superior court, or this court, with an adequate record to evaluate this claim. According to the Governor, because petitioner did not submit to the trial court the entire record that was before the Board, this court should presume that the record contains some evidence in support of the Governor's decision. Moreover, the Governor asserts, in the superior court petitioner did not contest the facts recited in the Governor's decision.

Petitioner's traverse, however, did deny allegations of the Governor's return and alleged, for example, that the Governor's statements describing

the circumstances of the crime "take certain facts out of context" and must be placed in perspective by considering other facts. Petitioner contended—both in the superior court and in this court—that the Governor's decision itself, considered in light of undisputed matters in the record, demonstrated that the Governor relied upon improper factors and mischaracterized certain evidence. Furthermore, the Governor submitted to the superior court certain excerpts from the record containing evidence supporting particular aspects of his decision, and he also relied upon matters contained in exhibits submitted with petitioner's pleadings in the superior court. Thus, the entire record that was before the Board and the Governor is not necessary to evaluate petitioner's contentions.

Petitioner does not challenge, for the most part, the Governor's factual description of the circumstances of the crime or petitioner's subsequent conduct and statements before he surrendered to the authorities. Petitioner does contend, however, that the crime he committed does not constitute a factor upon which the Governor properly may rely in denying parole. A prisoner's crime constitutes a factor tending to demonstrate unsuitability for parole, where the prisoner committed the offense in an especially heinous, atrocious, or cruel manner. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) Under the regulation, among the circumstances that support a finding that the prisoner committed the offense in this manner is that "the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder." (*Ibid.*)

The Governor's decision stated that petitioner "brutally murdered" his victim after "a full week of careful preparation, rehearsal and execution." The decision further stated that petitioner fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement. In addition, the Governor's decision refers to the report prepared for petitioner's probation and sentencing hearing, which indicated that an aggravating factor for purposes of sentencing included the planning, sophistication, or professionalism with which the crime was carried out. Contrary to petitioner's assertions, these circumstances support a finding that the offense was carried out in a dispassionate, calculated manner.

Petitioner asserts that the Governor is precluded from relying upon the foregoing circumstances, because at petitioner's criminal trial the jury acquitted him of first degree murder and thus necessarily found a reasonable doubt that he premeditated and deliberated the murder. Petitioner does not dispute, however, that the foregoing circumstances constitute *some* evidence that he engaged in premeditation and deliberation. The circumstance that the

jury, for whatever reason, did not find *beyond a reasonable doubt* such premeditation and deliberation does not preclude the Governor from considering such evidence in exercising his discretion whether to reverse a Board decision granting parole. (Cf. *In re Dunham* (1976) 16 Cal.3d 63 [127 Cal.Rptr. 343, 545 P.2d 255, 76 A.L.R.3d 571] [acquittal after criminal trial does not preclude revocation of parole based upon evidence indicating that the individual committed the crime of which he was acquitted].) Nor does the jury's verdict in petitioner's criminal trial preclude this court from determining that some evidence supports the Governor's determination. To the extent that it is contrary to this conclusion, the Court of Appeal decision in *Rosenkrantz II, supra,* 80 Cal.App.4th at page 425, is disapproved.

Similarly, although the jury apparently accepted evidence received at petitioner's criminal trial as indicating that petitioner's emotional stress and motivation for the crime *reduced* his culpability, the Governor was not required by law to credit the same evidence when exercising his constitutional authority in reviewing a parole decision of the Board. Although the Governor is required to consider whether the prisoner committed the crime as the result of significant stress in his or her life, the importance attached to this circumstance is left to the judgment of the Governor. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) The Governor specifically found that the events and problems confronting petitioner during the week preceding his commission of the crime did not offset the serious nature of the offense. As we have explained, the applicable standard of review is extremely deferential to the Governor's decision, and our inquiry strictly is limited to whether some evidence supports the Governor's assessment of the circumstances of petitioner's crime—not whether the weight of the evidence conflicts with that assessment or demonstrates that petitioner committed the offense because of extreme stress. Accordingly, we determine that the Governor properly could rely upon the circumstances of the crime in deciding that petitioner is not presently suitable for parole.

Petitioner next asserts that his conduct during the weeks following the crime does not support the Governor's determination that petitioner now poses a risk of danger to society. The Governor characterized this conduct, described above, as an affirmation of petitioner's violent act. The conduct also could be viewed as an indication that petitioner did not show signs of remorse during this period. (See Cal. Code Regs., tit. 15, § 2402, subd. (d)(3) [an inmate's demonstration of remorse tends to establish suitability for parole].) Although remote in time from the Governor's assessment of petitioner's present suitability for parole, we do not find that this conduct was irrelevant to the Governor's decision whether petitioner now poses a risk of danger to society.

Petitioner further contends that no evidence supports the Governor's determination that petitioner, subsequent to his conviction, has lied repeatedly about numerous aspects of the offense in order to minimize his culpability. Among these asserted lies are petitioner's reference to the altercation with his brother and Redman at the beach house as "an attack upon himself" (i.e., upon petitioner), and a statement that Redman "did a bad thing" before the murder. The Governor's decision stated: "However, it was [petitioner] who used a stun gun on his brother multiple times while holding him on the ground, had Mr. Redman detained, forced his brother to retrieve tapes from his car, and stated that he was willing to kill both his brother and Mr. Redman to protect his secret."

Although evidence in the record indicates that petitioner engaged in the conduct described in the foregoing quotation, the circumstance that petitioner committed such acts does not support the Governor's determination that petitioner lied at a recent parole hearing when he described the altercation at the beach house as an attack upon himself, or that petitioner lied when he stated that the victim had done a bad thing. This aspect of the Governor's decision omits any consideration of the events that prompted petitioner's conduct. For example, the Governor does not dispute the evidence establishing that Redman kicked in the door of petitioner's family beach house, while shouting "get the fuck out of here you faggots," for the purpose of taking photographs of petitioner and his companion and exposing petitioner's secret that he was gay. Nor does the Governor dispute that Redman and petitioner's brother were armed with a flashlight and a stun gun when they confronted petitioner inside the house, and that they used these weapons to injure petitioner by burning his hands and breaking his nose. No reasonable interpretation of these circumstances supports a determination that petitioner lied or otherwise sought to avoid responsibility for his crime by describing the event as an attack upon himself or by describing Redman's conduct as "a bad thing." Although the Governor possesses the discretion to characterize petitioner's *response* to this event as excessive or inappropriate, nothing in the record upon which the Governor relies supports the determination that petitioner lied about the incident at the beach house or improperly sought to minimize his own culpability by describing it as an attack upon himself.

Indeed, a more complete quotation of petitioner's statements at the parole hearing at which he indicated that Redman had done a "bad thing" establishes that petitioner took responsibility for his subsequent actions. In response to a question regarding how he felt about what he had done, petitioner stated in part: "I can tell you right now that [Redman], by and large, was echoing, obviously, attitudes that were injected into him by

someone else. It wasn't a type of thing that was unusual, I would say, among kids in that area at the time. [Redman] was a little bit more physical in it, you know. I hesitate to speak about [Redman] in any way that would tend to indicate I think otherwise but *he did a bad thing, I did a much worse thing.* I'll regret it for the rest of my life." (Italics added.) These statements by petitioner do not constitute some evidence that he lied about aspects of the crime in order to minimize his culpability, as the Governor determined.

As further support for the determination that petitioner has lied to minimize his culpability, the Governor's decision asserted that at past parole hearings petitioner has made conflicting statements regarding his telephone call to a nurse, in which he stated that he had done society a favor by killing Redman. The portions of the record cited by the Governor in support of this assertion, however, indicate only that at a parole hearing in 1996, petitioner *admitted* making the statement to the nurse, and that at the June 2000 parole hearing, a deputy district attorney argued that *at his criminal trial* petitioner disputed the accuracy of the police report describing petitioner's conversation with the nurse. Even if this argument by the deputy district attorney could be considered as constituting evidence that petitioner lied at his criminal trial, the foregoing evidence does not constitute some evidence that petitioner continues to lie, or that he ever has lied at a parole hearing, in order to minimize his culpability.

Finally, the Governor's decision asserted that petitioner sought to reduce his culpability by consistently stating at parole hearings that his father ordered him to leave home after the altercation at the beach house, but that at trial petitioner testified he left voluntarily. In support of this assertion, the Governor cites generally the Court of Appeal's decision in *Rosenkrantz I*, as well as conflicting statements made *by attorneys* at petitioner's June 2000 parole hearing. The appellate decision does not indicate whether petitioner left home voluntarily (*Rosenkrantz I, supra*, 198 Cal.App.3d at pp. 1193, 1196-1997), and the inconsistent comments of *counsel* at the parole hearing do not constitute some evidence that *petitioner* has given inconsistent statements regarding this point.

In sum, although petitioner's conduct in the several weeks following the crime and before he surrendered to the authorities constitutes some evidence that he did not show any remorse during that period, there is no evidence supporting the Governor's additional determination that petitioner has continued seeking to avoid responsibility for his crime by lying about pertinent events or by improperly attempting to portray himself as a victim.

The final factor discussed in the Governor's decision concerned petitioner's conduct in prison. The heading of this section of his decision stated:

"[Petitioner's] institutional behavior does not outweigh the circumstances of the crime in assessing his suitability for parole." The discussion of this factor comprised a single sentence: "Although [petitioner] has been discipline free and continued his education while in prison, the State of California expects this of all prisoners."

Petitioner contends that the foregoing passage from the Governor's decision concerning petitioner's behavior in prison demonstrates that the Governor conducted a mere pro forma review that completely disregarded petitioner's exemplary conduct and rehabilitation—a circumstance indicating that he presents a very low risk of future violence. We agree with petitioner that, although the state expects prisoners to behave well in prison, the absence of serious misconduct in prison and participation in institutional activities that indicate an enhanced ability to function within the law upon release are factors that must be considered *on an individual basis* by the Governor in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d); *In re Minnis, supra,* 7 Cal.3d 639, 645.) The Governor's decision, however, indicated that he did afford petitioner individualized consideration with regard to this factor. For example, the decision stated that the gravity of the offense and other circumstances "outweigh the arguments advanced for release, such as . . . his prison record or his parole prospects." Therefore, the Governor did not disregard petitioner's behavior in prison solely because the state expects all prisoners to behave well, but rather considered it as a factor—although one outweighed by the gravity of the offense.

 As established above, some evidence supports the Governor's determination that the circumstances of petitioner's crime, as well as his conduct before he surrendered to the authorities, tend to establish that petitioner is not suitable for parole. The Governor's decision stated that *each* of these factors demonstrates that petitioner would pose a significant risk of danger to society. Although the Governor also determined that petitioner would pose a risk of danger to society because he recently has lied about the circumstances related to the offense in order to minimize his culpability, and we have concluded that this determination is not supported by some evidence, the decision of the Governor made clear that he independently found that petitioner poses a risk of danger based upon the nature of the offense and petitioner's conduct before he surrendered.

 The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (*In re Minnis, supra,* 7 Cal.3d 639, 647; *In re Ramirez, supra,* 94 Cal.App.4th 549, 569; *In re Seabock* (1983) 140 Cal.App.3d 29, 36-37 [189 Cal.Rptr. 310].) Although the parole authority is

prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant. (*In re Seabock, supra,* 140 Cal.App.3d at pp. 36-37.) The Governor's decision in the present case adopted such an approach and relied, in addition, upon petitioner's conduct—affirming his violent act—while he remained a fugitive during the several weeks following commission of the crime. Nothing in the Governor's decision indicates that he failed to afford petitioner individualized consideration of all relevant factors, or that the Governor's determination was based upon a blanket policy of denying parole to all individuals convicted of murder.

In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . ." (Pen. Code, § 3041, subd. (a).) "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date." (*In re Ramirez, supra,* 94 Cal.App.4th at p. 570.) As we have seen, however, the Governor has emphasized certain circumstances of petitioner's offense, as well as his postoffense conduct, that involve particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder. Accordingly, the Governor properly could consider the nature of the offense in denying parole.

Therefore, we conclude that the Governor's decision finding petitioner unsuitable for parole is supported by some evidence.

## VII

Petitioner contends, and the trial court found, that the Governor follows a blanket policy of denying parole to all prisoners who have been

convicted of murder. This policy, petitioner maintains, establishes that the Governor did not afford petitioner individualized consideration of the factors relevant to determining parole suitability, despite the discussion of such factors in the Governor's written decision, and that for this reason petitioner was denied due process of law. We conclude that the evidence upon which petitioner relies does not support the trial court's finding that the Governor has adopted or follows a blanket policy of denying parole when exercising his authority pursuant to article V, section 8(b).

The Governor contends that any judicial inquiry into the question whether a Governor follows a policy of not granting parole is barred by the separation of powers doctrine. He relies upon decisions holding that prisoners cannot inquire into the political motivations and mental processes of Board commissioners rendering parole decisions. (E.g., *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1099 [97 Cal.Rptr.2d 382].) Such decisions, however, simply hold that these officials cannot be compelled to testify regarding their subjective mental processes in reaching a decision. (*Id.* at pp. 1100-1101.) Nothing prevents a court from reviewing the record and other admissible evidence to ascertain whether the decision in a particular case has been made in accordance with applicable legal standards. (*Ibid.*) It is well established that a policy of rejecting parole solely on the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law. (*In re Minnis, supra,* 7 Cal.3d at p. 647.) Admissible evidence indicating that a Governor made a parole decision in accordance with a blanket no-parole policy properly could be considered by a court in determining whether the decision satisfies due process requirements.

The trial court relied upon the following evidence in concluding that the Governor has a policy of denying parole to prisoners serving a life term, regardless of the circumstances. An article appearing in the April 9, 1999, edition of the Los Angeles Times stated: "[I]n an interview, the governor was adamant that he believes murderers—even those with second-degree convictions—should serve at least a life sentence in prison. [¶] Asked whether extenuating circumstances should be a factor in murder sentences, the governor was blunt: 'No. Zero,' he said." (Lesher, *Davis Takes Hard Line on Parole for Killers*, L.A. Times, *supra,* at p. A-3.) The article further quoted the Governor as stating: " 'They must not have been listening when I was campaigning. . . . If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from. . . . We are doing exactly what we said we were going to do.' " (*Ibid.*) Petitioner entered into evidence the deposition of the news reporter who conducted the Governor's interview for

this article. The reporter stated that his recollection was that the Governor made the statements attributed to him in the article.

In addition, the trial court relied upon evidence establishing that during the period from the Governor's assumption of office in January 1999 through April 2001, the Board had held 4,800 parole suitability hearings and granted parole to 48 inmates. The Governor did not request that the Board forward to him for review any cases in which the Board denied parole, and the Governor did not review any such cases. Of the 48 inmates who were granted parole by the Board, the Governor reversed 47 of the Board's decisions. Since April 2001, the Governor let stand one other Board decision granting parole to an inmate convicted of murder. (Governor Gray Davis, statement on Paroles of Cheryl Sellers and Valere Boyd, press release Apr. 10, 2002, located at <www.governor.ca.gov/state/govsite/gov_homepage.jsp> [as of Dec. 16, 2002] [letting Board's grant of parole stand for Cheryl Sellers who murdered her husband, who had abused her "physically, sexually, socially, economically and psychologically over a number of years," but reversing grant of parole for Valere Boyd, who also murdered her husband and claimed to suffer from battered woman syndrome, but whom the Governor found "would pose a danger to public safety if released" and "would benefit from further participation in anger management programs"; the Governor's decision on Cheryl Sellers stated that "I review each case on its merits and consider all relevant factors"].)

We conclude that the evidence relied upon by the trial court does not support its finding that the denial of petitioner's parole was based upon a policy of automatically denying parole to all murderers. As the Governor contends, the circumstance that the Governor has permitted the parole of two persons convicted of murder is inconsistent with the conclusion that he has adopted a blanket policy of denying parole to all murderers. Even if the quotations in the above newspaper article accurately reflected the views the Governor held at the time the statements were made, the Governor's subsequent actions, both in granting parole in some instances and in providing individualized analyses for each of his parole decisions in the cases that have come before him, belie the claim that the Governor has adopted a blanket policy of denying parole without regard to the circumstances of the particular case.

Petitioner has not presented any evidence establishing that the Governor's actual decisions reversing grants of parole by the Board failed to engage in an individualized consideration of the factors concerning parole suitability, or that the decisions themselves reflected or relied upon any blanket policy of denying parole to all murderers. The circumstance that the Governor has

reversed most of the Board's decisions granting parole does not establish that he follows a blanket policy of denying parole or that his decision in the present case was based upon such a policy, rather than upon a consideration of the factors and evidence discussed in the Governor's lengthy written decision denying petitioner parole. Such reversals simply may indicate that the Governor is more stringent or cautious than the Board in evaluating the circumstances of a particular offense and the relative risk to public safety that may be posed by the release of a particular individual.

In sum, we conclude that the evidence does not support the trial court's finding that the Governor follows a policy of denying parole to all prisoners convicted of murder without regard to the circumstances of the individual case.

## VIII

For the reasons discussed above, the judgment of the Court of Appeal is reversed and the requested writ of habeas corpus is denied.

Baxter, J., Moreno, J., and Nicholson, J.,* concurred.

**WERDEGAR, J.,** Concurring.—I agree with the majority that the judgment of the Court of Appeal should be reversed. I write separately to set forth why, in my view, Proposition 89 (enacting Cal. Const., art. V, § 8, subd. (b)) does not offend the ex post facto clauses of the federal and state Constitutions (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9).

Petitioner's ex post facto challenge to Proposition 89 is difficult. This is because the United States Supreme Court's jurisprudence in this area offers no clear resolution. None of the easy answers suffices. While the increased time petitioner spends in prison because of Proposition 89 "is not 'in some technical sense part of the sentence' " (*Lynce v. Mathis* (1997) 519 U.S. 433, 445 [117 S.Ct. 891, 898, 137 L.Ed.2d 63]), this fact is of no consequence (*ibid.*). While Proposition 89 operates in the realm of discretionary parole decisionmaking, the high court has made clear that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause . . . ." (*Garner v. Jones* (2000) 529 U.S. 244, 253 [120 S.Ct. 1362, 1369, 146 L.Ed.2d 236].) While Proposition 89 can be described as procedural rather than substantive, that label does not "immunize it from scrutiny under the *Ex Post Facto* Clause." (*Collins v. Youngblood* (1990) 497 U.S. 37, 46 [110 S.Ct. 2715, 2721, 111 L.Ed.2d 30].) While the high court has found no

---

*Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

constitutional infirmity in arguably analogous laws adding a layer of judicial review (*Mallett v. North Carolina* (1901) 181 U.S. 589 [21 S.Ct. 730, 45 L.Ed. 1015]) or substituting the judge for the jury as the sentencing authority in capital cases (*Dobbert v. Florida* (1977) 432 U.S. 282 [97 S.Ct. 2290, 53 L.Ed.2d 344]), in neither case was the law in question challenged as retroactively increasing punishment.

In fact, the high court has struggled case by case to adapt the requirements of the ex post facto clause to a variety of laws affecting the exercise of discretion in parole matters. This difficult task is unavoidable because "[t]he danger that legislatures might disfavor certain persons after the fact is present even in the parole context, and the Court has stated that the *Ex Post Facto* Clause guards against such abuse." (*Garner v. Jones, supra,* 529 U.S. 244, 253 [120 S.Ct. 1362, 1369].) The most recent culmination of the high court's efforts is the test articulated in *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499 [115 S.Ct. 1597, 131 L.Ed.2d 588], and restated in *Garner v. Jones, supra,* at page 251 [120 S.Ct. at page 1368]: A new rule governing the exercise of parole discretion violates the ex post facto clause if it "creates a significant risk of prolonging [a prisoner's] incarceration." "When the rule does not by its own terms show a significant risk, the [prisoner] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." (*Id.* at p. 255 [120 S.Ct. at p. 1370].)

If the *Garner/Morales* test applies, Proposition 89 probably fails. Petitioner argues that the law by its own terms significantly increases the risk that life prisoners will serve longer periods of incarceration because the law can operate only to the detriment of such prisoners, whom the Governor has always been empowered to release (Cal. Const., art. V, § 8, subd. (a)) but whose release the Governor could not block until Proposition 89 was enacted. But whether or not this facial argument has merit, certainly the evidence drawn from Proposition 89's practical implementation demonstrates that the law's retroactive application has resulted in longer periods of incarceration. During the current Governor's term in office, only two of more than a hundred life prisoners offered parole by the Board of Prison Terms (board) have actually been released. Proposition 89 was intended by the voters to increase the time persons convicted of murder would spend in prison by giving the Governor power to "block" their parole. (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) rebuttal to argument against Prop. 89, p. 47.) Clearly the law is having the intended effect.

Thus, the *Garner/Morales* test strongly suggests a particular resolution. The only significant question, in my view, is whether the test applies. My

own conclusion, despite Proposition 89's evident purpose and effect, is that the *Garner/Morales* test does not apply and the law is constitutional. Both before and after Proposition 89, a person convicted of murder in California and sentenced to life with the possibility of parole has been entitled to nothing more than a parole decision by the executive branch made in accordance with the applicable statutory and administrative standards. To substitute the state's chief executive for a subordinate executive branch agency has no apparent constitutional significance. Both must make parole decisions in accordance with the applicable standards for granting parole. Neither enjoys a judge's relative independence from the political process: while a Governor is elected by the voters and must stand for reelection every four years (Cal. Const., art. V, § 2), a member of the board is appointed to a four-year term by the Governor with the advice and consent of the Senate (Pen. Code, § 5075, subd. (a)). To argue that Proposition 89 is invalid under the *Garner/Morales* test requires one to compare the risk that any particular Governor will deny parole with the risk that any particular board will do likewise. This is hardly different than arguing that a particular Governor's or board's parole decisions violate the ex post facto clause because that Governor or those members campaigned on the platform of granting parole less generously than their predecessors.

While the high court's decisions are far from clear on this point, I believe it most likely that the high court has endeavored to avoid such results. I discern this partly from *Garner v. Jones, supra*, 529 U.S. 244, 253 [120 S.Ct. 1362, 1369], in which the court qualified its endorsement of a risk-based test by "say[ing] with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised." I also discern this from *California Dept. of Corrections v. Morales, supra*, 514 U.S. 499, 509 [115 S.Ct. 1597, 1603], in which the high court wrote that it has "declined to articulate a single 'formula' for identifying those legislative changes that have a sufficient effect on substantive crimes or punishments to fall within the constitutional prohibition . . . ." The basic point of *Morales* was to emphasize that the ex post facto clause is concerned only with significant risks of increased punishment and, thus, to avoid entangling the judiciary in micromanagement of "innocuous adjustments" to parole and sentencing procedures. (*Id.* at p. 508 [115 S.Ct. at pp. 1602-1603].) Here, the risk of increased punishment attributable to Proposition 89 arguably is significant. Yet that increased risk manifests as an exercise of discretion by the same branch of government to which parole decisions historically have been entrusted, subject to the same standards as before. Under these circumstances, my best judgment is that the *Garner/Morales* test does not apply to Proposition 89 and the law does not violate the ex post facto clause.

**MORENO, J.**—I concur in the majority opinion. I write separately to emphasize one aspect of the opinion and its implications for the future of petitioner's case.

The majority upholds the Governor's decision denying parole because of his findings on the nature of petitioner's commitment offense. But as the majority states: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . .' (Pen. Code, § 3041, subd. (a).) 'The Board's authority to make an exception [to the requirement. of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be *particularly egregious* to justify the denial of a parole date.' " (Maj. opn., *ante*, at p. 683, italics added.) The majority concludes that there was no due process violation in this case because the Governor reasonably found "certain circumstances of petitioner's offense, as well as his postoffense conduct, . . . involve[d] particularly egregious acts *beyond the minimum necessary to sustain a conviction for second degree murder.*" (*Ibid.*, italics added.)

The Governor's primary reason for finding the circumstances of petitioner's offense particularly egregious is that it involved premeditation and deliberation, and that, as the Governor stated, the petitioner "should be grateful that he was not convicted of first degree murder." Although I agree that evidence of premeditation and deliberation supports the conclusion that petitioner's crime was particularly egregious for a *second degree* murder, it is another matter whether any evidence would support the same conclusion for a *first degree* murder. Other than felony murders, first degree murders by definition involve premeditation and deliberation. Moreover, there was sufficient doubt over whether premeditation and deliberation existed to persuade a jury to acquit petitioner of first degree murder. Furthermore, petitioner's offense did not appear to partake of any of those characteristics that

make an offense particularly egregious under the Board of Prison Terms' parole eligibility matrix for first degree murders, e.g., torture, the infliction of severe trauma not involving immediate death, or murder for hire. (Cal. Code Regs., tit. 15, § 2403, subd. (b).) Nor is it certain that petitioner's lack of remorse immediately following the crime, by itself, would make the crime exceptional compared to other first degree murders.

The significance of the above observations is this: there will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a *first degree* murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense. (See *In re Ramirez* (2001) 94 Cal.App.4th 549, 570-571 [114 Cal.Rptr.2d 381] [in conducting parole proportionality analysis, the court considers the gravity of the offense in relation to the time in prison already served].) Under this circumstance, the justification for denying his parole would become less clear, even under the deferential "some evidence" standard. Thus, future denials of petitioner's parole may warrant judicial reappraisal.

**CHIN, J.**—I dissent. Robert Rosenkrantz's continued incarceration violates the rule against ex post facto laws.

For over two centuries, a bedrock principle of American criminal justice, embedded in both the United States Constitution[1] and the California Constitution,[2] has been that no state may pass an ex post facto law, which includes a law that increases the punishment for a crime after it has been committed. (*Calder v. Bull* (1798) 3 U.S. (3 Dall.) 386, 390-391 [1 L.Ed. 648, 650.) Among other things, the ex post facto clause guards against the "danger that legislatures might disfavor certain persons after the fact . . . ." (*Garner v. Jones* (2000) 529 U.S. 244, 253 [120 S.Ct. 1362, 1369, 146 L.Ed.2d 236] (*Garner*).) Robert Rosenkrantz committed a murder in 1985, for which he received an indeterminate prison sentence of 17 years to life with the possibility of parole. The Board of Prison Terms (Board), which at the time of the crime determined when a convicted murderer would be released on parole, has ordered his release. However, the Governor, acting pursuant to a

---

[1]"No state shall . . . pass any . . . ex post facto law . . . ." (U.S. Const., art. I, § 10, cl. 1.) A different provision of the Constitution also prohibits the federal government from passing an ex post facto law. (U.S. Const., art. I, § 9, cl. 3.)

[2]"A[n] . . . ex post facto law . . . may not be passed." (Cal. Const., art. I, § 9.) Article I, section 16, of the original Constitution of 1849 provided: "No . . . ex post facto law . . . shall ever be passed." (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 295, fn. 10 [279 Cal.Rptr. 592, 807 P.2d 434].)

law enacted *after* the crime, has blocked Rosenkrantz's parole and ordered his continued incarceration. Changing the law in this way after the fact to prolong Rosenkrantz's incarceration is impermissible.

The California Constitution, article V, section 8, subdivision (b) (article V, section 8(b)), gave the Governor the power to reverse the Board's decision to grant parole to convicted murderers. It was added in 1988 when the electorate passed Proposition 89. The ballot argument in favor of Proposition 89 makes its purpose clear: "Under Proposition 89, the Governor, for the first time, will have the power to *block the parole* of convicted murderers." (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) argument in favor of Prop. 89, p. 46, italics added; see also *id.* at p. 47 [Proposition 89 will give "the Governor the authority to block the parole of criminals who still pose a significant threat to society"].) The proposition's supporters pointed out that the Governor always had "the power to grant reprieves, pardons and commutations," and thus could always "act on behalf of more lenient treatment of convicted criminals"; but, they argued, "the state's top elected official should *also* be given the power to protect the public from the early release of still dangerous killers." (*Id.* at p. 46)

In practice, Proposition 89 has functioned exactly as intended: to block parole that convicted murderers would otherwise receive and to keep them in prison. The record shows that the current Governor has never exercised this power to reverse the denial of parole, but only to reverse the grant of parole. And during one period of over two years, the Governor employed this power to prevent the release on parole in 47 out of 48 cases in which the Board granted parole (out of a total of 4,800 hearings). (Maj. opn., *ante*, at pp. 684-685.) As of today, it appears the Governor has blocked parole in over 100 cases and permitted parole only twice. (*Id.* at pp. 638, fn. 5, 685.)

Although the prohibition against ex post facto laws goes back to the founding days of this nation, a decision less than three years old virtually compels its application to this case. (*Garner, supra,* 529 U.S. 244.) In *Garner,* as here, the question was whether a procedural change in the way the parole release decision is made can violate the ex post facto prohibition. There, the change was Georgia's extending the interval between parole hearings from three years to as much as eight years. The high court stated that, although the grant of parole is discretionary, "[r]etroactive changes in laws governing parole of prisoners, in some instances," may impermissibly increase the punishment for a crime after its commission. (*Id.* at p. 250 [120 S.Ct. at p. 1367].) "Whether retroactive application of a particular change in parole law respects the prohibition on *ex post facto* legislation is often a question of particular difficulty when the discretion vested in a parole board

is taken into account." (*Ibid.*) The court cited its decision in *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499 [115 S.Ct. 1597, 131 L.Ed.2d 588], which had found no ex post facto violation in California's extending the time between parole hearings from one to up to three years, as "emphasizing that not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." (*Garner, supra,* 529 U.S. at p. 250 [120 S.Ct. at p. 1367].)

But the high court made clear that although not all changes in parole law implicate the ex post facto clause, some do. "The danger that legislatures might disfavor certain persons after the fact is present even in the parole context, and the Court has stated that the *Ex Post Facto* Clause guards against such abuse." (*Garner, supra,* 529 U.S. at p. 253 [120 S.Ct. at p. 1369].) The court explained that mere changes in the way discretion is exercised cannot violate the clause. "[W]here parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised." (*Ibid.*) But other changes, including procedural changes, may be prohibited. The court stated the test to determine whether a retroactive change in parole law violates the prohibition against ex post facto laws: "In the case before us, [the inmate] must show that as applied to his own sentence the law created a significant risk of increasing his punishment." (*Id.* at p. 255 [120 S.Ct. at p. 1370].) Or, stated slightly differently, "The question is whether the amended Georgia Rule creates a significant risk of prolonging [the inmate's] incarceration." (*Id.* at p. 251 [120 S.Ct. at p. 1368].)

Sometimes deciding this question requires evidence. "When the rule does not by its own terms show a significant risk, the [inmate] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." (*Garner, supra,* 529 U.S. at p. 255 [120 S.Ct. at p. 1370].) The *Garner* record "contained little information bearing on the level of risk created by the change in law." (*Id.* at p. 256 [120 S.Ct. at p. 1371].) The court remanded the matter to give the inmate a chance to make the required showing. (*Id.* at p. 257 [120 S.Ct. at p. 1371].)

*Garner* makes clear that retroactive changes in parole law, even procedural ones—other than mere changes in the exercise of discretion—are impermissible if they create a significant risk of prolonging the prisoner's actual incarceration. The *Garner* court could not decide the question without further evidence. We do not have that problem. Whether viewing the law's impact on Rosenkrantz himself or on parolees generally, we know that

retroactive application of article V, section 8(b), created a significant risk of prolonging incarceration. Indeed, it has prolonged Rosenkrantz's incarceration to a certainty. But for the Governor's action, he would now be released on parole.[3] Moreover, the fact that during an approximately two-year period the Governor blocked 47 of 48 grants of parole shows that, in general, the new rule's application has significantly increased the risk of prolonging incarceration.

The conclusion is inescapable: retroactive application of article V, section 8(b), to do what it was designed to do—block parole for convicted murderers—violates the prohibition against ex post facto laws. The Maryland Court of Appeals has reached a similar conclusion. (*Gluckstern v. Sutton* (1990) 319 Md. 634 [574 A.2d 898, 912-916].)

The majority finds *Garner* inapplicable because it views article V, section 8(b), as only a change in the way discretion is exercised. (Maj. opn., *ante*, at pp. 647-650.) I fully agree that mere changes in the way discretion is exercised or, indeed, in who exercises it, would not constitute an ex post facto law. If article V, section 8(b), had abolished the Board and shifted parole decisions to the Governor, the ex post facto clause would not be implicated. Nor would it be implicated if a Board member were replaced with a new member who promised to be stricter in granting parole. Such changes would merely affect who exercises discretion and how. But article V, section 8(b), did not *replace* the Board. As the Maryland Court of Appeals noted in similar circumstances, "the requirement of gubernatorial approval for parole is an *additional* requirement." (*Gluckstern v. Sutton, supra*, 574 A.2d at p. 916, italics added.) Rosenkrantz "now needs the favorable decisions of both the [Board] and the Governor in order to be

---

[3]The majority notes that the Board granted Rosenkrantz parole only under compulsion of *In re Rosenkrantz* (2000) 80 Cal.App.4th 409 [95 Cal.Rptr.2d 279], a decision it describes as "questionable." (Maj. opn., *ante*, at p. 637 & fn. 4.) It seems to believe, but does not explain how, this circumstance is relevant to the ex post facto issue. Questionable or not, the earlier decision became *final* over two years ago when this court denied review. All that is now prolonging Rosenkrantz's incarceration is the Governor's exercise of a power created after Rosenkrantz's crime, which presents the ex post facto issue squarely.

The majority also seems to suggest it is doing Rosenkrantz a favor by even considering this issue because he presented the issue to us belatedly. (Maj. opn., *ante*, at pp. 625, 637.) He cannot, however, be accused of abandoning this issue. He did present it in the trial court. He *prevailed* in that court, although on different grounds, so he had little reason to appeal this issue to the Court of Appeal. He again *prevailed* in the Court of Appeal. Rosenkrantz focused on defending his victories, not trying to win on ever more grounds. This threshold issue underlies the entire case. Accordingly, we issued an order, quite properly (Cal. Rules of Court, rule 29.2(b)), placing the issue within the scope of our review. In any event, belated presentation of the issue is irrelevant to its merits which, as the majority notes, "may be decided as a matter of law." (Maj. opn., *ante*, at p. 637.)

paroled." (*Id.* at p. 915.)[4] Thus, article V, section 8(b), added a previously nonexistent *barrier* to parole. Previously, convicted murderers had to convince the Board to release them, a very difficult thing to do, as this record attests. Now they not only must convince the Board, they also must convince the Governor to affirm the Board's decision.[5]

The majority cites *Johnson v. Gomez* (9th Cir. 1996) 92 F.3d 964 (*Johnson*) and *In re Arafiles* (1992) 6 Cal.App.4th 1467 [8 Cal.Rptr.2d 492]. But these decisions predate the current indisputable evidence that the Governor has consistently applied article V, section 8(b), solely to prolong the incarceration of persons who would otherwise be released on parole. More importantly, they also predate *Garner.* For example, *Arafiles* erroneously believed that "the issue is not the actual application to the petitioner . . . ." (*In re Arafiles, supra,* 6 Cal.App.4th at p. 1484.) On the contrary, *Garner* holds that the issue is indeed the actual application of the law to the inmate's "own sentence." (*Garner, supra,* 529 U.S. at p. 255 [120 S.Ct. at p. 1370].)

The *Johnson* court said that because under the old law the Board's decision to grant parole would not have been subject to review, but now is subject to review, "it cannot be said with certainty that the [Board] would have granted [the inmate] parole had it possessed the final review authority." (*Johnson, supra,* 92 F.3d at p. 967.) The court also said the inmate "would have to show 'with assurance,' to use the *Dobbert* language [*Dobbert v. Florida* (1977) 432 U.S. 282 [97 S.Ct. 2290, 53 L.Ed.2d 344]] . . . that he would have received parole under the old system," and that the inmate must "demonstrate an increase in punishment with certainty before finding an Ex Post Facto Clause violation." (*Johnson, supra,* at p. 968.) This requirement of "certainty" and "assurance" is inconsistent with the test the high court applied *in the parole context* in *Garner.* Moreover, the Board, an official agency charged with the very serious duty of making parole decisions, is presumed to exercise its own good judgment. We should not base our ex post

---

[4]Similarly, article V, section 8(b), did not merely "substitute" one decision maker for another. (Conc. opn. of Werdegar, J., *ante,* at p. 687.) Nor did it make " '*innocuous adjustments [such] as changes to the membership of the Board of Prison Terms . . . .*' " (Maj. opn., *ante,* at p. 646, quoting *California Dept. of Corrections v. Morales, supra,* 514 U.S. at p. 508 [115 S.Ct. at pp. 1602-1603], italics added by the majority.) Changes in the Board's membership concern me not at all.

As the majority notes, *Gluckstern v. Sutton, supra,* 574 A.2d 898, discussed ex post facto law that then existed but is now somewhat obsolete. (Maj. opn., *ante,* at p. 644, fn 8.) It also predated *Garner, supra,* 529 U.S. 244. Its analysis, however, fits *Garner* and adds further support to my conclusion.

[5]If adding "a new level of review of parole decisions" (maj. opn., *ante,* at p. 650) is permissible, how many new levels of review will the majority permit? After the crime is committed, how many new bodies can be given the power to veto parole? Just one more, as here? Two? Three? One hundred?

facto jurisprudence on the assumption the Board's exercise of discretion varies depending on whether or not the Governor can overrule its decisions.

The high court cases that the majority cites do not support its conclusion, especially in light of the more recent *Garner* decision. In *Mallett v. North Carolina* (1901) 181 U.S. 589 [21 S.Ct. 730, 45 L.Ed. 1015], the court merely held that new rules allowing the prosecution to appeal certain adverse rulings did not violate ex post facto principles. *Dobbert v. Florida, supra*, 432 U.S. 282, involved the *substitution* of the court for the jury as the decision maker, not an *additional* layer of review. (See *Gluckstern v. Sutton, supra*, 574 A.2d at p. 916 [distinguishing *Dobbert* on this basis].) The changes in those cases are far different from imposing, after the crime, a new barrier to parole for the very purpose of prolonging incarceration. Neither of these high court cases even involved a claim that a retroactive change in law increased punishment. Moreover, as the *Johnson* court noted, the high court in *Dobbert* "found no violation because the law was only a procedural change and because it appeared the change would benefit defendants in most cases by providing that the trial judge and the state's highest court would have the final say on whether the death penalty was imposed." (*Johnson, supra*, 92 F.3d at pp. 966-967.) To say the least, the change here does not benefit inmates. And "simply labeling a law 'procedural,' . . . does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause. [Citation.] Subtle *ex post facto* violations are no more permissible than overt ones." (*Collins v. Youngblood* (1990) 497 U.S. 37, 46 [110 S.Ct. 2715, 2721, 111 L.Ed.2d 30].) I doubt that article V, section 8(b), or the supporting ballot arguments, or blocking parole in 47 of 48 cases, can be described as "subtle," but the new law, although procedural, is an ex post facto violation.

Another case the majority cites, *Collins v. Youngblood, supra*, 497 U.S. 37, involved reformation of improper jury verdicts. It, too, bears little similarity to this case. Its primary significance here is its statement, quoted in the previous paragraph, that labeling a new law procedural does not immunize it from the ex post facto rule.

The majority seems to suggest that article V, section 8(b), is merely a neutral change in who has the final say in parole decisions. It is not neutral. Although it permits the Governor to reverse all parole decisions, including those denying parole, it is one-sided both facially and in practice. As Proposition 89's supporters stressed, the Governor always had the power to *commute* sentences. (See Cal. Const., art. V, § 8, subd. (a).) What article V, section 8(b), did, "for the first time," was also give the Governor the power to "block" parole. (Ballot Pamp., Gen. Elec., *supra,* argument in favor of Prop. 89, p. 46.) Although written neutrally, the only *change* it made was to

allow the Governor to keep persons incarcerated who otherwise would be released. It is a new barrier to parole, nothing else. Its purpose and effect are solely to block parole, and it has fulfilled this purpose with great effect.

The ex post facto clause guards against the "danger that legislatures might disfavor certain persons after the fact . . . ." (*Garner, supra,* 529 U.S. at p. 253 [120 S.Ct. at p. 1369].) Here article V, section 8(b), targeted a disfavored group, and it did so after the fact. Admittedly, convicted murderers are not a sympathetic group, but the ex post facto clause protects everyone. And the Board itself treats this group unsympathetically. As this record shows, the Board has been very cautious in its parole decisions. It granted parole a scant 48 times in 4,800 hearings over an approximately two-year period, which means it denied parole 99 percent of the time. The Board has hardly opened the floodgates; nor should we. But imposing after the fact a new barrier to parole that potentially keeps in prison even those scarce few who convince the Board they have earned it violates the prohibition against ex post facto laws.

I would affirm the judgment of the Court of Appeal.[6]

Kennard, J., concurred.

---

[6]In those cases not involving retroactive application of article V, section 8(b), I agree with the majority that the Governor's decision is subject to judicial review to determine whether "some evidence" supports it. (Maj. opn., *ante,* at pp. 625-626.)